COURT OF APPEALS OF VIRGINIA

Present:   Chief Judge Decker,[*] Judge Malveaux and Senior Judge Haley
Argued at Fredericksburg, Virginia

JOAQUIN SHADOW RAMS, SR., A/K/A
  JOHN ANTHONY RAMIREZ, JR., A/K/A
  JOHN ANTHONY RAMIREZ, A/K/A
  JUQUIN ANTHONY RAMS, A/K/A
  JOAQUIN SHADOW RAMS, A/K/A
  JOAQUIN S. RAMS

                                                          OPINION BY
v.      Record No. 1453-17-4           CHIEF JUDGE MARLA GRAFF DECKER
                                                   FEBRUARY 26, 2019
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF PRINCE WILLIAM COUNTY
Randy I. Bellows, Judge Designate

Meghan Shapiro, Deputy Capital Defender (Christopher Leibig; Law
Offices of Christopher Leibig, on briefs), for appellant.

Christopher P. Schandevel, Assistant Attorney General (Mark R.
Herring, Attorney General, on brief), for appellee.


Joaquin Shadow Rams, Sr., appeals his conviction for capital murder in violation of Code

§ 18.2-31.[1]  He argues that the circumstantial evidence was insufficient to prove that the death

was a homicide and, consequently, that he was the criminal agent.  The appellant also contends

that the circuit court's denial of his request for a bill of particulars regarding the specific cause of

death that the Commonwealth sought to prove violated his due process rights.  We hold that the

---

[*] On January 1, 2019, Judge Decker succeeded Judge Huff as chief judge.

[1] This Court has jurisdiction to hear appeals from capital murder convictions that do not
result in the death penalty.  See Code § 17.1-406(A)(i); see also Code § 17.1-406(B) ("[A]ppeals
lie directly to the Supreme Court from a conviction in which a sentence of death is imposed.").
The appellant was sentenced to life without parole.

evidence was sufficient to support the appellant's conviction and the denial of his request for a

bill of particulars was not reversible error. Consequently, we affirm the challenged conviction.

## I. BACKGROUND[2]

### A. The Victim and the Crime

The appellant's son, P.R., was born on July 1, 2011. The appellant and P.R.'s mother

resided together at the time of the birth, but the mother moved out with P.R. when he was about

two weeks old. The mother had sole legal and physical custody of the child, and the appellant

was eventually permitted to have unsupervised visitation.

P.R. developed normally as an infant and met all developmental milestones. Between

eleven and fifteen months of age, P.R. had at least five febrile seizures, which were described by

various doctors as "benign."[3] Each seizure was "brief," lasting two seconds to ten minutes. P.R.

stopped breathing briefly during one of the seizures, but each one resolved on its own without

the need for resuscitation. P.R. had one of those seizures during a visit with the appellant.

A pediatric neurologist examined P.R. after the first three seizures and opined that he was

a "neurologically . . . and developmentally normal" infant who was experiencing "classic febrile

seizures." After that visit, P.R.'s mother provided the appellant with information regarding the

seizures. That information included cooling P.R. during a seizure with a sponge bath.

On October 20, 2012, during visitation with the appellant, fifteen-month-old P.R. became

unresponsive and later died. The appellant, who reported that he found P.R. unresponsive in his

---

[2] When addressing a challenge to the sufficiency of the evidence, the appellate court reviews the evidence "in the light most favorable to the Commonwealth, the prevailing party below," and considers all "reasonable inferences fairly deducible from that evidence." Stevens v. Commonwealth, 38 Va. App. 528, 533 (2002).

[3] The evidence established that a febrile seizure is a seizure triggered by a fever. Two to four percent of children have febrile seizures. These children "are neurologically normal but their brains are sensitive to the presence of a temperature."

crib, claimed that P.R. was "very hot" and in the midst of a seizure. Others in the home who responded to the appellant's pleas for help could not confirm these claims. In the presence of witnesses, the appellant splashed the child with cold water in the bathtub while waiting for emergency medical personnel to arrive. First responders found P.R. cold, wet, and unresponsive. They began cardiopulmonary resuscitation (CPR) and other emergency measures, and transported P.R. to the hospital by ambulance. He was eventually resuscitated at the hospital, but he died the next day. The death occurred after the appellant had purchased more than $500,000 of insurance on P.R.'s life.

### B. Pre-Trial Motions and Theories of the Case

The appellant was charged with capital murder under an indictment alleging in relevant part that he "kill[ed]" P.R. "deliberately and with premeditation." The parties consulted numerous medical experts in preparation for trial. Those experts agreed that P.R.'s death resulted from oxygen deprivation, which led to irreversible brain damage and cardiac arrest. However, opinions varied regarding the precise cause of P.R.'s death.

The appellant filed several pre-trial motions seeking a bill of particulars requiring the Commonwealth to specify what cause or causes of death it sought to prove. The trial court denied the motions. The Commonwealth's initial theory of the case, which the prosecutor conveyed to the appellant verbally prior to trial, was that the appellant drowned P.R. for the insurance money. The appellant contended that P.R. died from a febrile seizure or some other noncriminal cause. During trial, the prosecution altered its theory to contend that in addition to drowning, the death could have resulted from suffocation.

C. The Trial Court's Ruling

After considering the evidence, the court convicted the appellant of capital murder and sentenced him to life in prison without possibility of parole.[4] The court also ordered him to pay a fine of $100,000. In the course of finding the appellant guilty, the court made extensive factual findings, many of which are outlined below.

1. Natural Causes of Death and the Appellant's Credibility

The trial judge rejected the theory that P.R. died from a febrile seizure. In doing so, he relied in large part on the testimony of Dr. Shlomo Shinnar, a professor and pediatric neurologist. The judge, in finding Dr. Shinnar to be the "most experienced, most knowledgeable, and most credible on the issue of febrile seizures and other neurology issues," noted that even one of the appellant's experts recognized Dr. Shinnar as "the 'febrile seizure king.'" Shinnar opined to a reasonable degree of medical certainty that given P.R.'s "strong family history of [such] seizures, he [fell] into" a particular category of inherited febrile seizures and that children in this category are "at high risk for frequent febrile seizures but not at increased risk of mortality."[5] The judge accepted Shinnar's specific testimony that children do not die from febrile seizures and that "[i]t is 'beyond any shadow of a doubt' that a febrile seizure was not a contributor in [P.R.]'s death." The judge also noted numerous other expert witnesses who confirmed Dr. Shinnar's opinion that febrile seizures do not lead to cardiac arrest or death.

The judge next recounted the evidence surrounding the events of October 20, 2012. He noted that the only evidence tending to indicate that P.R. had a seizure that day came from the

---

[4] The appellant also was convicted of attempted false pretenses in violation of Code § 18.2-178. This conviction stemmed from misrepresentations that he made when he applied for the insurance on the child's life. The validity of this conviction is not in dispute in this appeal.

[5] P.R.'s mother, like P.R., experienced febrile seizures as a child, and she eventually outgrew them. P.R.'s maternal grandfather had also exhibited febrile seizures.

appellant, and he concluded that the appellant was lying. The judge based this finding on evidence contradicting the appellant's stated observations about P.R. The appellant reported that he had observed P.R. having a seizure just before another member of the household called 911 at 2:20 p.m. The judge additionally noted that during the call, at approximately 2:21 p.m., the appellant stated that P.R. was "really hot." When emergency medical personnel arrived "at the patient's side" at 2:27 p.m., they found the child in cardiac arrest and attempted to resuscitate him. However, in contrast to the appellant's report that P.R. was "really hot," the emergency responder who was "the first person to put hands on" the child upon arriving six minutes later testified that P.R. was "cold" and "pale" and "had bluish lips." Another first responder, who carried P.R. to the ambulance before it departed minutes later, noted that when he picked the child up, "he was very cold to the touch." Finally, when P.R.'s temperature was taken at the hospital at 2:44 p.m., it was 91.2 degrees, which was "hypothermic." At 3:00 p.m., hospital personnel resuscitated P.R., but he was later declared brain dead and was removed from life support the following day.

The judge found, based on evidence that P.R. was cold to the touch at 2:27 p.m. and had a hypothermic temperature of 91.2 degrees at the hospital seventeen minutes later, that P.R. could not have been "really hot" at 2:21 p.m. as the appellant had claimed. He noted expert testimony that it would take "a couple of hours," not a mere twenty-three minutes, for the child's body to cool from 98 to 91 degrees and that a "child should still feel hot" or "warm to the touch even [if] splashed with cold water," as P.R. had been. Dr. Shinnar also opined that it was "not medically plausible that the child was actively convulsing . . . in the way the [appellant] ha[d] stated" and "a few minutes later was dead and cold." The judge recognized that other witnesses testified that the reported drop in temperature was "understandable and credible," but he "was not persuaded by these witnesses." Further, the judge concluded from the seizure and breathing

- 5 -

activity that the appellant reported, as well as his claim regarding the child's temperature, that the appellant did not simply misperceive the immediate aftermath of cardiac arrest for a febrile seizure. The judge specifically found that the appellant "was lying" about P.R.'s temperature to support his bigger "false claim" that he had witnessed the child having a febrile seizure that turned fatal.

Finally, the judge found nothing in P.R.'s medical records to indicate that he died of some other natural cause or accident. The judge discussed and rejected theories of "natural" death including sudden unexplained death in epilepsy, sudden unexplained death in childhood, cardiac arrhythmia, and "some combination of a seizure and an obstructed airway in the crib." He also concluded that the statements of the appellant that he found to be false, made during the course of the emergency, proved that "the cause of [P.R.'s] death [was] not . . . accidental." The judge reasoned that if the occurrence had been accidental, the appellant would have had no reason to "have told these elaborate lies[] and placed [P.R.] in the bathtub . . . to cool him off."

## 2. *Corpus Delicti*: Unnatural Death and Criminal Agency

The judge then turned to the issue of the *corpus delicti*. He pointed to established case law providing that a court considering the cause of a death is not limited to evidence regarding the body itself and may also consider the surrounding circumstances. He noted further that the Commonwealth was not required to prove the precise cause of death as long as the trier of fact found beyond a reasonable doubt that the victim's death was caused by the criminal agency of another rather than by suicide, accident, or some noncriminal natural cause.

The judge specifically found that "[P.R.'s] oxygen supply was cut off," causing cardiac arrest and "irreversible brain damage." He further found that the oxygen deprivation resulted from drowning or suffocation and that these were not natural causes on the facts of this case. The judge instead concluded from the evidence that P.R.'s death resulted from the criminal

- 6 -

agency of another. He noted that the appellant told several lies to emergency medical personnel and that these showed guilty knowledge and criminal intent. Finally, the judge held that the appellant was the only person who had motive, opportunity, and means to commit the murder.

### a. Motive

Regarding motive, the judge found that the appellant was "in desperate financial straits" at the time of P.R.'s death and "st[ood] to benefit financially" from it. He noted that the appellant's finances were "on a downward spiral" from 2009 to 2012. The appellant initially received financial help from his girlfriend, P.R.'s mother, but within a few weeks of P.R.'s birth on July 1, 2011, she moved out of the appellant's residence with P.R. and stopped paying the mortgage. The appellant then began renting out his home in order to pay the mortgage, while he and his teenaged son S.R. lived with his friends Harold and Sue Jestice.

In September of 2011, the appellant filed for custody of P.R. and began purchasing insurance on P.R.'s life. Between September and November 2011, the appellant obtained three insurance policies totaling almost $525,000, which was about $6,000 more than the outstanding mortgage balance on the appellant's home.

In July 2012, the appellant was granted unsupervised visitation with P.R. On September 8, 2012, P.R. had a febrile seizure during a visit with the appellant. On September 21, 2012, the appellant's visitation was cancelled "due to [P.R.'s] seizure and sickness." Consequently, the appellant knew by that time that P.R. had experienced at least two febrile seizures. The very next day, September 22, 2012, despite the fact that the appellant's financial situation remained "bleak" and the bank had referred his home mortgage for foreclosure, the appellant texted his realtor that he was "thinking of moving back home." Then, less than a month later, the appellant again texted his realtor and confirmed that she should take the house off the market because he would be "moving . . . back [in]to [it]," buying new appliances, having the house repainted, and

- 7 -

maybe even "doing the deck or pool." The judge found "nothing" in the appellant's "financial life" at that time that would cause him to believe that he could pay the mortgage arrearages and the new monthly mortgage payments, as well as buy new appliances and put in a deck or pool. Finally, the judge specifically noted that "even though [the appellant] was so broke he couldn't pay his mortgage, he never missed a premium payment on [P.R.'s] life insurance policies."

b. Opportunity

Regarding the appellant's opportunity to kill P.R. on the day in question, the judge found that the murderer would have needed five to ten minutes alone with the child to commit the crime. The judge accepted evidence, including the testimony of the Jestices, that P.R. seemed normal during his visit that morning. The Jestices further related that they left the appellant's portion of their home, located on the second floor, between 12:00 and 1:35 p.m. so that P.R. could nap. The appellant was then alone in his room with P.R. for some period of time and later put P.R. in his crib in S.R.'s bedroom. Sometime after 2:00 p.m., the appellant yelled to Roger Jestice to "call 911." Roger grabbed the phone and ran upstairs while dialing. Upon arriving upstairs, he saw the appellant holding P.R. in the bathtub while splashing water onto the lower portion of the child's body.

The judge evaluated the testimony of S.R., upon whom the appellant relied in part for his alibi. He concluded that S.R.'s testimony about when various things happened that day was unreliable because the thirteen year old was distracted while playing a video game. The judge determined, based on his finding that S.R. was not a credible reporter of events due to inattention, that the appellant had a period of at least forty-five minutes, between when the Jestices departed and when the appellant claimed to have discovered P.R. having a seizure, during which the appellant could have inflicted the fatal injuries. In the alternative, the judge concluded that even if he credited S.R.'s testimony, the appellant had what S.R. testified was

- 8 -

"'*about*' five minutes" alone with P.R. before putting the child into his crib during which the appellant could have killed him. (Emphasis added). The judge found that S.R. could simply not have noticed that P.R. was dead when he passed the child, who was lying on his stomach in the crib, on his way to the bathroom.

### c. Means

Regarding means, the judge noted that the appellant had ready access to the water needed to drown P.R., as well as to a pillow with which to suffocate him. The judge also observed that the appellant, in defending himself, "focused on what occurred *after* [P.R.] was removed from the crib." (Emphasis added). The court, however, emphasized that the appellant had access to the same sources of water *before* he put P.R. in his crib. Further, the judge noted that experts who ruled out drowning as a possible cause of death did so at least partially because no witnesses reported seeing P.R. "submer[ged]" in water to an extent that could have caused drowning. Although those experts obviously took the reported observations of the witnesses, including the appellant, at face value, the judge was not required to do so. Accordingly, the evidence left open the possibility that P.R. had in fact been submerged in a sufficient amount of water to cause drowning. Consequently, the judge found that the evidence proved that the appellant killed P.R. by either drowning or suffocating him.

### II. ANALYSIS

The appellant contends that the evidence was insufficient to support his conviction for capital murder. He also suggests that the circuit court's denial of his request for a bill of particulars violated his due process rights.

### A. Sufficiency of the Evidence

The appellant argues that the evidence did not support his conviction in two ways. First, he suggests that the Commonwealth did not prove the *corpus delicti*—that P.R.'s death resulted

from a criminal act. Second, the appellant contends that the circumstantial evidence as a whole failed to establish his guilt.

"When considering a challenge to the sufficiency of the evidence to sustain a conviction, th[e appellate court] reviews 'the evidence in the light most favorable to the prevailing party at trial and consider[s] all inferences fairly deducible from that evidence.'" Clark v. Commonwealth, 279 Va. 636, 640 (2010) (second alteration in original) (quoting Jones v. Commonwealth, 276 Va. 121, 124 (2008)). "Viewing the record through this evidentiary prism requires [the court] to 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn [from that evidence].'" Cooper v. Commonwealth, 54 Va. App. 558, 562 (2009) (quoting Parks v. Commonwealth, 221 Va. 492, 498 (1980) (emphasis omitted)).

"The fact finder, who has the opportunity to see and hear the witnesses, has the sole responsibility to determine their credibility, the weight to be given their testimony, and the inferences to be drawn from proven facts." Hamilton v. Commonwealth, 279 Va. 94, 105 (2010) (quoting Commonwealth v. Taylor, 256 Va. 514, 518 (1998)). When expert witnesses give conflicting opinions, "a credibility battle" arises, and it is up to the fact finder to determine which expert's testimony is more credible. See Riner v. Commonwealth, 268 Va. 296, 329-30 (2004). Similarly, where a single witness makes contradictory statements on direct and cross-examination, those statements "go not to competency but to the weight and sufficiency of the testimony. If the trier of the facts sees fit to base [its ruling] upon that testimony[,] there can be no relief in the appellate court." Towler v. Commonwealth, 59 Va. App. 284, 291 (2011) (quoting Swanson v. Commonwealth, 8 Va. App. 376, 379 (1989)). Additionally, in drawing inferences from the evidence, the fact finder may conclude regarding even a non-testifying

defendant that his false statements establish that he has lied to conceal his guilt.  See Shackleford v. Commonwealth, 262 Va. 196, 209-10 (2001); Rollston v. Commonwealth, 11 Va. App. 535, 545, 548 (1991).

The sufficiency "inquiry does not distinguish between direct and circumstantial evidence, as the fact finder . . . 'is entitled to consider all of the evidence, without distinction, in reaching its determination.'"  Commonwealth v. Moseley, 293 Va. 455, 463 (2017) (quoting Commonwealth v. Hudson, 265 Va. 505, 512-13 (2003)).  Circumstantial evidence is not "viewed in isolation" because the "combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable [fact finder]" to conclude beyond a reasonable doubt that a defendant is guilty.  Muhammad v. Commonwealth, 269 Va. 451, 479 (2005).

When circumstantial evidence is involved, the evidence as a whole must be "sufficiently convincing to exclude every reasonable hypothesis except that of guilt."  Dowden v. Commonwealth, 260 Va. 459, 468 (2000).  However, the Commonwealth is "not required to exclude every possibility" of the defendant's innocence but, rather, "only . . . hypotheses of innocence that flow from the evidence."  Id.  "The reasonable-hypothesis principle . . . is 'simply another way of stating that the Commonwealth has the burden of proof beyond a reasonable doubt."  Moseley, 293 Va. at 464 (quoting Hudson, 265 Va. at 513).  The reasonableness of "an alternate hypothesis of innocence" is itself a question of fact, and thus, the fact finder's determination regarding reasonableness "is binding on appeal unless plainly wrong."  Wood v. Commonwealth, 57 Va. App. 286, 306 (2010) (quoting Emerson v. Commonwealth, 43 Va. App. 263, 277 (2004)).  "By finding the defendant guilty, therefore, the [fact finder] 'has found by a process of elimination that the evidence does not contain a reasonable theory of innocence.'"

Haskins v. Commonwealth, 44 Va. App. 1, 9 (2004) (quoting United States v. Kemble, 197 F.2d 316, 320 (3d Cir. 1952)).

Finally, "[i]f there is evidence to support the conviction[], the reviewing court [may not] substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial." Clark, 279 Va. at 641 (quoting Commonwealth v. Jenkins, 255 Va. 516, 520 (1998)). Again, the appellate court will reverse the judgment of the trial court only if it is "plainly wrong or without evidence to support it." Id. at 640 (quoting Wilson v. Commonwealth, 272 Va. 19, 27 (2006)).

It is in light of these guiding legal principles that the Court considers the appellant's arguments.

### 1. *Corpus Delicti*

The appellant challenges various aspects of the evidence related to proving the *corpus delicti*.

"The *corpus delicti* is a material fact to be established in every criminal prosecution." Bowie v. Commonwealth, 184 Va. 381, 389 (1945) (quoting Nicholas v. Commonwealth, 91 Va. 741, 750 (1895)); see Jackson v. Commonwealth, 255 Va. 625, 645 (1998). The term "means, literally, 'the body of a crime'" and refers to "the fact that the crime charged has been actually perpetrated." Aldridge v. Commonwealth, 44 Va. App. 618, 648 (2004) (first quoting Corpus Delicti, Black's Law Dictionary (7th ed. 1993); and then quoting Lucas v. Commonwealth, 201 Va. 599, 603 (1960)). In other words, the prosecution must prove "that the alleged offense was attributable to a criminal act, and not to mere accident or chance." Id. As it relates to murder, "the *corpus delicti* has two components—death as the result, and the criminal agency of another as the means." Nicholas, 91 Va. at 750 (quoting Smith v. Commonwealth, 62 Va. (21 Gratt.)

- 12 -

809, 813 (1871)), cited with approval in Opanowich v. Commonwealth, 196 Va. 342, 355-56 (1954).

Virginia courts "have long held that the *corpus delicti* may be proven by circumstantial evidence." Epperly v. Commonwealth, 224 Va. 214, 229 (1982); see Opanowich, 196 Va. at 355 (quoting Bowie, 184 Va. at 390); Cochran v. Commonwealth, 122 Va. 801, 817 (1917); see also United States v. Russell, 971 F.2d 1098, 1110 n.24 (4th Cir. 1992). This is so because "[a]n examination of the body of a dead person will not always disclose whether death was from natural causes or . . . violence." Opanowich, 196 Va. at 355 (quoting Bowie, 184 Va. at 390). Consequently, "[t]he circumstances surrounding the cause of death may be inquired into[,]" and "[t]hey may or may not furnish a clue to the identity of the criminal agent." Id. (quoting Bowie, 184 Va. at 390). Virginia law also clearly permits proof of the "death" prong of the *corpus delicti* by circumstantial evidence. See Epperly, 224 Va. at 228-30; Edwards v. Commonwealth, 68 Va. App. 284, 297 (2017).

Finally, for at least a century, legal scholars have recognized that in many cases, proof that a death was criminal rather than natural and that the defendant was the criminal agent is "shown at the same time" because "the two matters are so intimately connected." 1 Francis Wharton, A Treatise on the Law of Evidence in Criminal Issues § 325f, at 655 (O. N. Hilton ed., 10th ed. 1912), quoted with approval in, e.g., State v. Deslovers, 100 A. 64, 68 (R.I. 1917); see Abdell v. Commonwealth, 173 Va. 458, 465-66, 470-72 (1939).

Notably, contrary to the appellant's argument, Virginia law also provides that motive is among the types of circumstantial evidence that may be used to establish both that a death was not the result of natural causes and that it was caused by the defendant. In Abdell v. Commonwealth, 173 Va. 458, for example, the Supreme Court of Virginia affirmed the defendant's conviction for murdering his wife based on circumstantial evidence proving beyond

a reasonable doubt that her death was a killing rather than a suicide, thereby establishing the *corpus delicti* as well as proving that the defendant was the criminal agent. The Court relied on evidence that the defendant authored two fake suicide notes ostensibly written by his wife; had numerous fights with her; and wanted "to escape the threat of a penitentiary sentence" after he beat her, providing "a specific motive" for the killing. Id. at 465-66, 470-72; see Edwards, 68 Va. App. at 297-301 (considering motive as part of the circumstantial evidence proving that the missing victim had been killed and the defendant was the criminal agent).[6]

The appellant relies on Betancourt v. Commonwealth, 26 Va. App. 363 (1998), to argue that motive may not be considered in establishing the *corpus delicti* of a murder. However, this Court held in Betancourt only that the circumstantial evidence in that case was insufficient to prove that the death of the adult victim was an intentional killing rather than a suicide or "self-inflicted" accidental overdose. Id. at 374-75. The Court ruled that all of the evidence, *including* that of motive, did not "prove beyond a reasonable doubt *either* the existence of a homicide *or* the identity of [the] appellant as the criminal agent." Id. at 375-76 (emphasis added). Consequently, Betancourt supports the principle that evidence of the appellant's motive was relevant to determining whether P.R.'s death was criminal rather than accidental or natural.

The appellant's reliance on Ferrell v. Commonwealth, 177 Va. 861 (1941), and Van Dyke v. Commonwealth, 196 Va. 1039 (1955), to support his argument regarding motive is

---

[6] Courts in other jurisdictions have also considered evidence of motive as proving that a death was not natural. See Beasley v. Holland, 649 F. Supp. 561, 568-69 (S.D. W. Va. 1986) (stating that under West Virginia law, the *corpus delicti* may be proved by circumstantial evidence including "means[ and] motive"), appeal dismissed, 841 F.2d 1122 (4th Cir. 1988) (*per curiam*) (unpublished); State v. Larson, 577 A.2d 767, 770-71 (Me. 1990) (in a case in which the defendant's new wife died in a suspicious fall, considering the defendant's purchase of "a substantial life insurance policy" on her, providing him with a motive to kill her, as evidence that "criminal agency [was] involved" to prove the *corpus delicti*); cf. People v. Washington, 585 N.Y.S.2d 407, 408 (N.Y. App. Div. 1992) (stating that proof of motive may adequately corroborate a confession for purposes of establishing the *corpus delicti* for a robbery).

similarly misplaced. Neither case involved any question regarding proof of the *corpus delicti* because it was undisputed that each victim was wounded by a gunshot fired by another. Ferrell, 177 Va. at 864-65; Van Dyke, 196 Va. at 1042-43. In that limited context, the Court stated in *dicta* that "the *absence* of motive is a factor for the consideration of the jury, but only as bearing on the question whether or not the crime was committed by the accused." Ferrell, 177 Va. at 873-74 (emphasis added) (quoting 2 Wharton, supra, § 878, at 1647); see Van Dyke, 196 Va. at 1046, 1049 (citing Ferrell, 177 Va. at 873-74). Consequently, Ferrell and Van Dyke are not controlling on the issue of whether the *presence* of motive is relevant to prove that a death resulted from criminal rather than natural causes.

Applying the relevant legal principles regarding proof of the *corpus delicti* in the appellant's case, including considering whether anyone had a motive to kill P.R., the trial court found that the circumstantial evidence proved that P.R.'s death was criminal and did not result from natural causes. That evidence included the appellant's false claims that he discovered P.R. seizing and "very hot" to the touch. It also included the motive derived from his dire financial condition combined with the more than $500,000 of insurance policies on P.R.'s life. Finally, the evidence also established that the appellant texted his real estate agent twice during the month prior to P.R.'s death that he could afford not only to move back into his home but also to undertake major improvements. This evidence was sufficient to disprove all reasonable hypotheses that P.R. died from natural, noncriminal causes.

The law does not require the Commonwealth to prove the precise cause of death, only that the death "resulted through a criminal agency." See Bowie, 184 Va. at 390; see Epperly, 224 Va. at 228-30 (affirming a conviction for first-degree murder despite the fact that the victim's body was never found and the cause of death never established because the evidence proved that the death was unnatural and the defendant was the criminal agent). The

- 15 -

Commonwealth was not required to furnish medical evidence independently excluding every conceivable natural cause of death in order to establish the cause was criminal. Further, contrary to the appellant's suggestion, the record establishes that the trial court did not improperly shift the burden to the appellant to disprove the *corpus delicti* and to establish a natural death. Instead, the trial court conducted a thorough analysis and found that the evidence excluded the natural cause of death advanced by the appellant, a febrile seizure, in part because the appellant lied about P.R.'s physical condition, including his temperature. The court also discussed and eliminated other natural and accidental causes of death, as analyzed in greater detail below. Finally, it found that the evidence as a whole, including the appellant's lies at the time of the medical emergency, proved a criminal cause.

The trial court was entitled to conclude that the only reasonable hypothesis flowing from the evidence, including the medical testimony, is that P.R. did not die of natural causes and that his death was a homicide caused by drowning or suffocation. The evidence established that Dr. Constance DiAngelo, who performed P.R.'s autopsy, concluded that the child died from drowning. Dr. William Gormley, the Chief Medical Examiner of Virginia, apparently acted within his authority as Dr. DiAngelo's supervisor when he later set aside her conclusion regarding the cause of P.R.'s death in the official autopsy report and issued an amended report changing the cause of death from drowning to "undetermined." Nevertheless, the trial court was not bound by Gormley's determination, and Gormley conceded that because DiAngelo performed the autopsy, she was "in the best position to see and understand what [she was] seeing." Gormley also explained that part of the reason that he set her conclusion aside was because he did not believe the evidence ruled out suffocation as a potential cause of death. Additionally, Dr. Shinnar opined that the "severe hypoxic ischemic insult" that led to P.R.'s death "was due to asphyxiation or to drowning" and that as a neurologist, he could not

distinguish between the two because "their effects on the brain would be very similar (oxygen deprivation)." As the appellant concedes, Drs. Tracey Corey and Janice Ophoven also stated that they could not exclude the possibility that the death was caused by suffocation.

The appellant argues that drowning as a possible cause of death was disproved. He notes that "even the shortest expert opinion" regarding the length of time that P.R. would have to have been submerged in order to drown was "at least a couple of minutes." The appellant emphasizes that "consistent witness accounts" indicate that he was "alone with [P.R.] with the tub running for mere seconds" and that he could not have drowned P.R. in this short a period of time. However, this argument relies on the appellant's view of S.R.'s testimony in the light most favorable to the appellant. Further, given the trial court's view of the evidence as establishing that P.R. suffered the fatal oxygen deprivation significantly earlier than right before the 911 call at 2:20 p.m., the evidence leaves open the possibility that the appellant could have drowned P.R. at an earlier time. Finally, the fact that experts had differences of opinion regarding whether death by drowning was a possibility did not prevent the trial court from finding that drowning was one of two possible causes of death. The court was entitled to weigh the testimony of the experts and make necessary findings of fact. See Riner, 268 Va. at 329-30.

The appellant also contends that the Commonwealth failed to disprove the reasonable hypothesis that P.R. died from natural causes.[7] He specifically mentions sudden infant death syndrome (SIDS), sudden unexplained death in childhood (SUDC), sudden unexplained death in epilepsy (SUDEP), and accidental suffocation during a febrile seizure. The evidence, viewed

---

[7] The appellant recognizes that the trial court rejected his assertion that P.R. was seizing when the appellant found him. He further concedes that, under the applicable standard of review, the prosecution "disproved the reasonableness of a death due solely to febrile seizure." Nevertheless, he argues that "other natural-death hypotheses remained" in part because "all experts," "*[t]aken together,*" "agreed that various natural-death hypotheses were possible." (Emphasis added).

- 17 -

under the proper standard, permitted the trial court to conclude that P.R. did not die from any of these noncriminal causes.

Dr. Shinnar opined that the fact that P.R. died from a hypoxic ischemic injury to the brain, which "takes a while to occur," was "not consistent with" the various forms of "sudden unexplained death" advanced by the appellant as possible natural causes. Dr. Shinnar explained that children with a history of complex febrile seizures who die from SUDC also have "malformations of the hippocampus" and that P.R.'s autopsy did not reveal such a malformation.[8] See Dowden, 260 Va. at 468 (explaining that the Commonwealth is required to exclude "only . . . hypotheses of innocence that flow from the evidence"). Dr. Shinnar further explained that SIDS differs from SUDC essentially based on the age of the child.[9] Consequently, his testimony that P.R. did not die from SUDC also refutes the theory that he died from SIDS.

Shinnar also eliminated SUDEP because P.R.'s medical records contained no indication that he suffered from epilepsy. The doctor further noted that even in children with epilepsy, which P.R. did not have, the rate of sudden unexplained death in otherwise normal children in P.R.'s age group is "extraordinarily low" and "basically doesn't happen." Consequently, the suggested hypothesis that P.R. had both (i) developed epilepsy, i.e., unprovoked seizures, and (ii) died from SUDEP did not flow from the evidence in the record. See id.

---

[8] The appellant argues that "while it is true that no malformed hippocampus was found" during the autopsy of P.R., "it is more accurate to say that it wasn't look[]for," in part because an MRI scan was not performed. Dr. Shinnar, however, stated that "all the descriptions of those hippocampal [abnormality] cases are from autopsy studies," and he opined that P.R.'s "autopsy should have been able to find [such a malformation] if it was there."

[9] The record establishes overlap in the definitions. Dr. Shinnar testified that SIDS covers children "under" two years of age. Other evidence in the record indicates that SUDC covers children "older than [one] year of age." P.R. was fifteen months old.

Additionally, Dr. Shinnar ruled out the possibility that P.R. might have suffocated by accident in his crib immediately following a seizure. First, Shinnar testified "to a reasonable degree of medical certainty[] that febrile seizures were not a contributor to [P.R.'s] death." Second, Dr. Shinnar's testimony excluded the theory that P.R. could have suffocated during a febrile seizure because his breathing was obstructed in some noncriminal way. Shinnar explained that if a breathing obstruction was present in the crib prior to the seizure, a healthy, active toddler such as P.R. would simply have "pushed it away." He further explained that to suffocate during a seizure, the child "would have to[,] while convulsing[,] remain prone even though [he was] shaking all over, and somehow be in a position that something [was] impairing [his] ability to breath[e] which before [he] started having the seizure wasn't there." Dr. Shinnar opined that this scenario was merely "a theoretical construct that [doctors] don't typically encounter or see" and that it would be "extraordinarily unusual" for it to occur. This testimony allowed the trial court to reject the notion of accidental suffocation.

Finally, the court rejected the hypothesis that P.R. could have died from a heart malfunction such as a spontaneous cardiac arrhythmia because "nothing in the record . . . would support this as a cause of death." Although Drs. Gormley, Ophoven, and Shinnar testified that such a cause of death was "possible," none of them stated that the autopsy report or anything else in the record tended to indicate that this was what occurred in P.R.'s case. Dr. Shinnar in fact testified affirmatively that nothing in P.R.'s medical history indicated that he had a cardiac arrhythmia. Dr. Robin Foster emphasized that if a child P.R.'s age had a "cardiac dysrhythmia" significant enough to lead to death, it would have "manifested [itself] in some way" prior to causing death. Consequently, this "possibility" also did not flow from the evidence. See id.

Based on the record in this case, the circumstantial evidence supports the trial court's finding that P.R.'s death was criminal and did not result from natural, noncriminal causes. The *corpus delicti* was proven.

2. Sufficiency of the Circumstantial Evidence Regarding Time and Opportunity

The appellant contends that the circumstantial evidence was insufficient to support his conviction because it established that he did not have the time or opportunity to kill P.R.

Settled principles provide that "[w]here the evidence is entirely circumstantial, . . . [t]he chain of necessary circumstances must be unbroken. The circumstances of motive, time, place, means, and conduct must all concur to form an unbroken chain [that] links the defendant to the crime beyond a reasonable doubt." Bishop v. Commonwealth, 227 Va. 164, 169 (1984). However, "not all of the listed circumstances must be proved in every case." Cantrell v. Commonwealth, 229 Va. 387, 398 (1985). Rather, "those circumstances [that] *are* proved must each be consistent with guilt and inconsistent with innocence, and . . . they must also be consistent with each other[;] that is to say, they must *concur* in pointing to the defendant as the perpetrator beyond a reasonable doubt." Id. "While no single piece of evidence may be sufficient, the 'combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable mind irresistibly to a conclusion [of guilt].'" Stamper v. Commonwealth, 220 Va. 260, 273 (1979) (quoting Karnes v. Commonwealth, 125 Va. 758, 764 (1919)).

The appellant relies on the testimony of his teenaged son S.R. about the appellant's movements and P.R.'s condition at various times to suggest that the evidence failed to prove the factors of time and opportunity in the circumstantial evidence chain. Consistent with this argument, he also challenges the trial court's assessment of S.R.'s credibility. The appellant notes that the court found S.R. unreliable—rather than dishonest—due to a variety of factors.

The appellant further points out that it was the Commonwealth that called S.R. to testify and that the court denied the Commonwealth's pre-trial request to treat S.R. as an adverse witness. He argues that the effect of the judge's ruling was "to *sua sponte* and retroactively find [S.R.] incompetent" to give evidence. We reject these arguments for several reasons and conclude that the evidence was sufficient to support the conviction.

S.R., who was thirteen years old at the time of his brother's death, testified that when he first saw P.R. in the appellant's room during his nap time on the day at issue, P.R. was lying on his back and snoring. The color of P.R.'s face was normal, and no blood was visible on his nose. Afterward, the appellant was alone with P.R. for what S.R. thought was "[a]bout" five minutes, but the teenager admitted that he "[didn't] really remember" how much time passed. At the end of that period of time, the appellant took P.R. to S.R.'s room and laid P.R. face down in his crib. S.R. was about six feet from the crib, playing an online action video game with three friends while wearing "one-sided" headphones. He did not "hear anything from [P.R.] at all" and did not "notice anything unusual." When S.R. later got up to go to the bathroom, "stood over the crib," and "rubbed [P.R.] on his back," S.R. did not "notice anything unusual about him." Finally, S.R. testified that "[m]aybe 15 to 25 minutes" after the appellant put P.R. in the crib, the appellant came back in to check on P.R., "scream[ed] out [P.R.]'s name," and took him to the bathroom.

The appellant's reliance on S.R.'s testimony to prove that he lacked the opportunity to kill the child is unavailing. The trial court was entitled to reject the teen's testimony, in whole or in part, and to accept the contradictory testimony of other witnesses. See Lea v. Commonwealth, 16 Va. App. 300, 304 (1993). Contrary to the appellant's suggestion, "[n]o litigant is bound by contradicted testimony of a witness even though []offered by the litigant." Williams v. Commonwealth, 234 Va. 168, 176 (1987). Also, in addition to assessing a witness' "veracity,"

the trier of fact may consider the impact of "perception, memory, [and] narrat[ive ability]" on the accuracy of the witness' testimony. See McCarter v. Commonwealth, 38 Va. App. 502, 506 (2002) (quoting Charles E. Friend, The Law of Evidence in Virginia § 4-1, at 101 (5th ed. 1993)). In short, based on a variety of factors, the trier of fact is free to believe or disbelieve, in whole or in part, the testimony of any witness. Carosi v. Commonwealth, 280 Va. 545, 554-55 (2010).

Here, it was entirely within the purview of the trial judge as the trier of fact to determine the credibility and accuracy of the testimony of S.R. and the other witnesses. The judge accepted the testimony of the Jestices that they left the appellant's area of their house between 12:00 and 1:35 p.m. The evidence relied upon by the judge also proved that P.R. was cold to the touch when rescue personnel arrived at the residence at 2:27 p.m. and had a "hypothermic" body temperature of 91.2 degrees at 2:44 p.m. Further, Dr. Shinnar, whose testimony the trial judge expressly credited, opined that it was "extremely improbable" that P.R.'s body temperature could have "go[ne] from really hot to really cold that fast" and, thus, that the claimed temperature change "ha[d] no plausibility." Finally, the trial court also expressly accepted the testimony of Dr. Gormley that it would have taken "a couple of hours" for P.R.'s body temperature to drop from the normal range to the hypothermic temperature measured at 2:44 p.m. Consequently, the evidence supports a finding that P.R. must have stopped breathing around 1:00 p.m. or earlier, rather than around the time of the 911 call at 2:20 p.m. Additionally, this evidence supports the judge's finding that S.R.'s testimony regarding P.R.'s condition at various points during his nap that day was inaccurate due to various factors. Those factors include the degree of S.R.'s distraction during his videogame, his limited view of P.R., and the "unmemorable" nature of the "routine" events that he was asked to recall.

- 22 -

The appellant argues that the timeline evidence does not fit the trial judge's findings of fact regarding when P.R. went into cardiac arrest. Pointing to the testimony of two defense witnesses, Dr. Ophoven and Dr. Brian Bridges, he asserts that the maximum length of time a patient can be in cardiac arrest before CPR is started and still have his or her heartbeat successfully restored is "10-15 min[utes]" or "[l]ess than 10 min[utes]." Calculating backward using this testimony, he reasons that the earliest that P.R. could have gone into cardiac arrest was fifteen minutes before the first responders began CPR at about 2:30 p.m., which would have been at about 2:15 p.m.

This argument mischaracterizes the evidence from Dr. Bridges. His testimony of "less than 10 minutes" was given in response to a different question—"how long" it takes to sustain "irreversible brain damage" "from the time the heart stops . . . if there is no resuscitation effort." Only after Bridges provided that response did the judge ask him about the subject that the appellant raises, concerning "the outer limit" of "restart[ing] . . . the heart . . . after a prolonged period without CPR." Dr. Bridges, a pediatric intensive care physician, candidly replied that he did not "know a specific time for that" and did not "know if anyone knows that." Bridges said that he had personally restarted a heart after "more than a half hour or an hour" without a heartbeat. Finally, when the judge asked specifically about P.R.'s case, in light of the fact that he had no pulse at 2:27 p.m. when emergency personnel arrived and began CPR and had his pulse restored at 3:00 p.m., Bridges said he was unable to opine how long before 2:27 p.m. P.R. "might not have had a pulse."

Consequently, the record contains conflicting evidence regarding how long a patient can be in cardiac arrest before CPR is begun and still have his or her heartbeat successfully restored. The trial judge was entitled to accept Dr. Bridges' testimony on this subject, that he did not "know if anyone knows that," over Dr. Ophoven's testimony, that the outer limit is "10 to 15

- 23 -

minutes." Additionally, the remaining evidence, such as that concerning P.R.'s cold body temperature, supports the trial court's finding that the child stopped breathing much longer than fifteen minutes before CPR was begun.[10]

For these reasons, the record supports the trial court's finding that the appellant had the time and opportunity to commit the crime and was the criminal agent in the murder of P.R.

### B. Bill of Particulars

The appellant argues that the trial court improperly denied his numerous motions for a bill of particulars regarding the Commonwealth's theory of the *corpus delicti*. He represents that he received "unofficial" verbal notice from the Commonwealth that "it planned to 'go with' the cause of death of 'drowning.'" He suggests that he was prejudiced because the Commonwealth began midway through trial to pursue suffocation as a cause of death and the trial court ultimately concluded that the cause of death was either drowning or suffocation. Although the appellant claims that he had an absolute right to this information prior to trial, the real crux of his claim is that he did not have adequate notice of suffocation as a possible cause of death in time to address it during the trial. He asserts that these errors violated his right to due process under both the United States and Virginia Constitutions.

On appeal of the denial of a request for a bill of particulars, the appellate court reviews the trial court's decision for an abuse of discretion. See Swisher v. Commonwealth, 256 Va.

---

[10] The trial court found in the alternative that the evidence remained sufficient to prove the offense even if it credited most of S.R.'s testimony about his observations of P.R. S.R. testified regarding a period of "'about' five minutes" during which "neither [the appellant] nor [P.R.] [was] with him," and he indicated that this period occurred immediately before the appellant put P.R. in his crib in S.R.'s room. S.R. expressed uncertainty regarding how much time passed between various events, and he provided mostly "yes" and "no" answers in response to leading questions on the subject of P.R.'s condition once the appellant put P.R. into the crib. Consequently, the trial court concluded that S.R. could simply have failed to notice that P.R., who was lying on his stomach, was already dead when S.R. later passed his crib. Based on our ruling, we do not address this alternative finding.

471, 480 (1998). To the extent the challenge involves interpreting the federal or state constitution, however, this is a question of law reviewed *de novo* on appeal. See Shivaee v. Commonwealth, 270 Va. 112, 119 (2005).

"Both the United States and Virginia Constitutions recognize that a criminal defendant enjoys the right to be advised of the cause and nature of the accusation lodged against him." Simpson v. Commonwealth, 221 Va. 109, 114 & n.3 (1980) (first citing U.S. Const. amend. VI; then citing Va. Const. art. I, § 8). The Supreme Court of Virginia has held that "[t]he important concerns evident in these provisions are fully honored" by Code §§ 19.2-220 and -221. Id. at 114. Code § 19.2-220 "requires that an indictment name the accused, describe the offense charged, identify the location of the alleged commission, and designate a date for the offense." Id. It further provides that the indictment need state only "so much of the common law or statutory definition of the offense as is sufficient to advise what offense is charged." Id. at 114-15 (quoting Code § 19.2-220). Code § 19.2-221 clarifies that "'short form indictments for murder and manslaughter'" are permitted, and it "specifically validates murder indictments [that] allege only that the defendant 'feloniously did kill and murder' the victim." Id. at 115 (quoting Code § 19.2-221). "As long as an indictment sufficiently recites the elements of the offense, the Commonwealth is not required to include all evidence upon which it plans to rely to prove a particular offense . . . ." Sims v. Commonwealth, 28 Va. App. 611, 619-20 (1998).

Pursuant to Code § 19.2-230, a court of record "may direct the filing of a bill of particulars." However, where the indictment "give[s] the accused 'notice of the nature and character of the offense charged so he can make his defense[,]' a bill of particulars is not required." Strickler v. Commonwealth, 241 Va. 482, 490 (1991) (citation omitted) (quoting Wilder v. Commonwealth, 217 Va. 145, 147 (1976)). Further, it is "improper" for a defendant to use a bill of particulars "to expand the scope of discovery in a criminal case." Quesinberry v.

Commonwealth, 241 Va. 364, 372 (1991); see Sims, 28 Va. App. at 620. A defendant is "not entitled to a bill of particulars as a matter of right," and whether the Commonwealth must file one is "within the discretion of the trial court." Quesinberry, 241 Va. at 372.

Applying these principles here, we conclude that the appellant has established no constitutional entitlement to notice of the precise manner in which the Commonwealth alleged that he caused his son's death. Cf. Simpson, 221 Va. at 115 (holding that indicting a defendant using the phrase "'during the commission of robbery while armed with a deadly weapon' did not constitute a waiver" of the Commonwealth's right to prove first-degree murder in some other way); id. (noting the absence of a constitutional or statutory requirement that "the indictment charge the degree of murder alleged or use the specific statutory language constituting that degree of offense"). The appellant was charged with capital murder under an indictment alleging in relevant part that he "kill[ed]" P.R. "deliberately and with premeditation." The record shows that by the time of the appellant's March 5, 2014 request for a bill of particulars, he knew that Dr. Shinnar had opined that the "severe hypoxic ischemic insult" that deprived P.R.'s brain of oxygen and led to his death was from *drowning or asphyxiation*. Additionally, the record reflects that Dr. DiAngelo's original autopsy report concluded that the child died from drowning while Dr. Gormley set aside that conclusion in his amended report of October 8, 2014, because he could "not rule out suffocation as a cause of death." The appellant referenced both Shinnar's and Gormley's statements in a pre-trial motion filed March 4, 2015, in which he sought to require the Commonwealth to elect a cause of death or require dismissal of the murder indictment, making clear that he was aware of these theories regarding the cause of death significantly in advance of his 2017 trial.

Further, when the appellant claimed surprise at trial based on the Commonwealth's change in its theory of the case to prove suffocation rather than drowning, he did not request a

continuance. Instead, at the close of the Commonwealth's case in rebuttal, he moved to strike the Commonwealth's evidence based on his claims that the Commonwealth was not permitted to change its theory regarding the cause of death and that the evidence did not prove drowning. Finally, the appellant concedes that "[i]t is fair to say that" any prejudice "might have been remedied by a continuance."

Thus, the record shows that the appellant had notice of the existence of an alternate theory of the case in time to satisfy any due process right to notice of the precise manner in which he was alleged to have caused his son's death. Cf. Coley v. Commonwealth, 55 Va. App. 624, 635-36 (2010) (holding that the appellant failed to prove reversible error when he learned at trial that the Commonwealth had exculpatory evidence because he "did not claim surprise, did not ask for a continuance," and "therefore suffered no prejudice"); cf. also Ortiz v. Commonwealth, 276 Va. 705, 723 (2008) (holding that where the trial court permitted a midtrial amendment to the time frame covered by the indictment and the court denied the defendant's request for a continuance, he was not entitled to reversal because he failed to prove that the amendment operated as a surprise or that the denial of his continuance motion prejudiced him); Lane v. Commonwealth, 20 Va. App. 592, 595 (1995) (rejecting the defendant's challenge to the admissibility of late-produced evidence under a state criminal discovery rule based on a claim of surprise because the defendant did not request a recess or continuance and instead "sought only suppression of the truth"). Accordingly, the appellant has failed to establish that the trial court erred by denying his request for a bill of particulars and convicting him for murder based upon the theory that he drowned or suffocated P.R.

### III. CONCLUSION

We hold that the evidence, viewed under the proper standard, was sufficient to prove that P.R.'s death was a homicide and that the appellant was the criminal agent. The record also

establishes that the denial of his request for a bill of particulars was not reversible error.

Consequently, we affirm the challenged conviction.

Affirmed.