COURT OF APPEALS OF VIRGINIA

Present: Chief Judge Decker, Judges AtLee and Frucci

TERENCE A. WELKER, JR.

v.     Record No. 1776-24-1

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION*
PER CURIAM
NOVEMBER 25, 2025

FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
Mary Jane Hall, Judge

(J. Barry McCracken, Assistant Public Defender, on brief), for
appellant. Appellant submitting on brief.

(Jason S. Miyares, Attorney General; John A. Fisher, Assistant
Attorney General, on brief), for appellee.

UNPUBLISHED

After a jury trial, the Circuit Court of the City of Norfolk convicted Terence Welker, Jr.,
of attempted malicious wounding and use of a firearm in the commission of a felony. Welker
asserts that the evidence failed to prove that he was present at the crime scene or that he fired a
weapon. Upon our review of the record, we find no error in the jury's findings and affirm.[1]

BACKGROUND

We recite the facts "in the 'light most favorable' to the Commonwealth, the prevailing
party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting
*Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). Doing so requires that we "discard the
evidence of the accused in conflict with that of the Commonwealth, and regard as true all the

___

* This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] After examining the briefs and record in this case, the panel unanimously holds that oral
argument is unnecessary because "the appeal is wholly without merit." Code § 17.1-403(ii)(a);
Rule 5A:27(a).

credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

In May 2023, Welker went to the home of Katanga Flowers-Elliott in the city of Norfolk looking for Katanga's son, Jason Elliott.[2] Welker told Katanga that if she did not "give Jason up" he was going to keep returning to her house until she did. Katanga did not know Welker and wondered why he was looking for Jason at her house because Jason did not live there. On May 17, 2023, after Welker returned again looking for Jason, Katanga obtained an emergency protective order. On May 20, 2023, Welker went to Katanga's house at around 9:00 a.m. and got into a fight with Katanga's sons, Javon and Jaylin. After the fight, the police were called and Katanga showed them the protective order. The police took Welker into custody on outstanding warrants and later served him with the protective order while Katanga went to the magistrate to take out a trespassing charge. Upon her return later that day, Katanga learned that Welker had returned in her absence and there had been a shooting.[3]

Javon testified that the first time he met Welker was on May 20, 2023. When Javon confronted Welker about his repeated visits to Katanga's house, the two agreed to fight. Javon explained that after the fight, the police took Welker away and while Katanga was at the magistrate, he and all three of his brothers gathered at Katanga's house. He testified that at around 1:00 p.m., he, Katanga, his three brothers, Linwood Haskins (his godfather), and Shawntez Howard (his friend), were at the house when Welker returned. Welker was with a friend and had something wrapped up in a black T-shirt that he carried in his hand. Javon stood

---

[2] We will refer to all the members of the Elliott family by their first name throughout this opinion to avoid confusion.

[3] On cross-examination, Katanga conceded that she previously testified she was at home when the shooting occurred, but she also acknowledged that her 911 call to police indicated she was still at the magistrate when the shooting occurred. Katanga testified that she did not remember if she was at home during the shooting.

nearby as Jason approached Welker in the street and the two appeared to exchange angry words. Javon testified that when Jason was "close enough to shoot," Welker pulled a pistol out of his T-shirt and began shooting. Javon saw the flash of the gun, heard gunshots, and felt the "bullets going pas[t]." As Howard returned fire, Javon and Jason both fled to the other side of a nearby car to hide. Welker then "kind of fled. He just ran away." On cross-examination, Javon conceded that in prior testimony he did not mention a T-shirt and only said he *heard* gunfire. He also agreed that his mother was *not* home at the time of the shooting.

Jason testified that when he saw Welker returning to Katanga's house, he moved to the middle of the street and prepared to fight. As Welker approached, Jason did not see him "pull a gun out and shoot," but he heard gunshots. As Howard fired back in "self-defense," Jason got out of the way of the bullets coming from both sides. After the police arrived, Jason retrieved the gun that Howard used in the shooting, gave it to the police, and told them that it was his firearm. He initially told the police that he fired the weapon during the incident, but at trial he denied shooting back and confirmed that Howard was "the one who had the pistol."

Officer David Gribble was dispatched to Katanga's house after the morning incident and arrested Welker. After Welker was released, Officer Gribble finished his paperwork and then left the police station. At that time, he saw Welker walking "northbound back toward the direction [he] came." Thereafter, Officer Gribble was dispatched to Katanga's house for a second time. After speaking with the Elliott family, he located eight shell casings on the ground. Seven casings were "clustered in a localized area further up the street, all brass colored in nature." He found another casing further away "near where the Elliott family was at in front of [Katanga's] residence." That casing "appeared to be a nickel plated or silver in color on the casing itself." A glass window was shattered on a parked car, and glass was "strewn about from that vehicle." The witnesses at the scene told him that Welker had returned to Katanga's house

and opened fire on them, shooting approximately seven rounds, before one person from their party shot one round in return. Jason gave Officer Gribble the nine-millimeter firearm Howard purportedly used to return fire.

Haskins testified that he observed Javon and Welker fighting in the morning on May 20, 2023, and then saw Welker return later that day. Haskins observed Welker and another man walking down the street, yelling, and "next thing you know, gunfire rung out." According to Haskins, Welker leaned over on the driver's side of Jason's Dodge Dart and began shooting at Jason with a "brown or tan" gun. Welker and his companion then fled the scene.

Jaylin testified that he was standing outside Katanga's house when Welker returned with his friend on the afternoon of May 20, 2023. Jaylin said that Jason met Welker in the street and asked if he wanted to fight. Jaylin did not see a weapon in Welker's hand, but he saw muzzle flashes and heard at least five or six gunshots before Welker and his friend fled. On cross-examination, Jaylin admitted that he told detectives he was inside the house during the shooting and saw nothing.

Jayce Elliott was also in front of Katanga's house when Welker and his friend approached. Jayce testified that Jason met Welker in the street and asked if he wanted to fight before shots were fired. He said that Welker "actually like . . . hid behind the car, aimed the gun, shot the gun, [and] shot it a couple times" before Jayce turned and ran.

After the Commonwealth rested, Welker moved to strike the evidence as insufficient to prove he was the shooter. Welker argued that the "vast majority of these witnesses have not been truthful in their testimony" and thus that they could not show that "if the shooting happened that day" that it was Welker. The circuit court denied the motion to strike.

Welker's grandfather, David Davis, testified that on May 20, 2023, Welker called him and asked for a ride from a location down the street from the police department. Davis testified

- 4 -

that he picked Welker up at around 11:12 a.m. and they went home. Welker and Davis stayed together until around 6:00 p.m. During that time, Welker went to McDonalds with his grandmother, but soon returned, and he went to the store to purchase a "Black" but again soon returned.

Welker renewed his motion to strike, and the circuit court again denied the motion. After closing arguments, the jury found Welker guilty of attempted malicious wounding and use of a firearm in the commission of a felony. Welker appeals.

ANALYSIS

On review of the sufficiency of the evidence to support a conviction, this Court will affirm the decision unless the circuit court was plainly wrong or the conviction lacked evidence to support it. *See Hargrove v. Commonwealth*, 77 Va. App. 482, 506-07 (2023). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *Hogle v. Commonwealth*, 75 Va. App. 743, 753 (2022) (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)). "Reasonable inferences drawn by the factfinder 'cannot be upended on appeal unless'" they are "'so attenuated that they push into the realm of *non sequitur*.'" *Commonwealth v. Wilkerson*, 304 Va. 92, 100 (2025) (quoting *Perkins*, 295 Va. at 332). In conducting its review, the "appellate court does not 'ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Commonwealth v. Barney*, 302 Va. 84, 97 (2023) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). Rather, the "relevant question is, after reviewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Sullivan v. Commonwealth*, 280 Va. 672, 676 (2010)).

Moreover, in evaluating the sufficiency of the evidence, a reviewing court "does not distinguish between direct and circumstantial evidence, as the fact finder . . . 'is entitled to consider all of the evidence, without distinction, in reaching its determination.'" *Commonwealth v. Moseley*, 293 Va. 455, 463 (2017) (quoting *Commonwealth v. Hudson*, 265 Va. 505, 512-13 (2003)). "The fact finder, who has the opportunity to see and hear the witnesses, has the sole responsibility to determine their credibility, the weight to be given their testimony, and the inferences to be drawn from proven facts." *Rams v. Commonwealth*, 70 Va. App. 12, 26-27 (2019) (quoting *Hamilton v. Commonwealth*, 279 Va. 94, 105 (2010)). "[T]his Court must accept 'the trial court's determination of the credibility of witness testimony unless, "as a matter of law, the testimony is inherently incredible."'" *Lambert v. Commonwealth*, 70 Va. App. 740, 759 (2019) (quoting *Nobrega v. Commonwealth*, 271 Va. 508, 518 (2006)).

"Evidence is not 'incredible' unless it is 'so manifestly false that reasonable men ought not to believe it' or [it is] 'shown to be false by objects or things as to the existence and meaning of which reasonable men should not differ.'" *Gerald v. Commonwealth*, 295 Va. 469, 487 (2018) (quoting *Juniper v. Commonwealth*, 271 Va. 362, 415 (2006)). "A legal determination that a witness is inherently incredible is very different from the mere identification of inconsistencies in a witness'[s] testimony or statements." *Kelley v. Commonwealth*, 69 Va. App. 617, 626 (2019). "Testimony may be contradictory or contain inconsistencies without rising to the level of being inherently incredible as a matter of law." *Id.* As such, "'[p]otential inconsistencies in testimony are resolved by the fact finder,' not the appellate court." *Id.* (alteration in original) (quoting *Towler v. Commonwealth*, 59 Va. App. 284, 292 (2011)).

Welker argues that the reliable evidence "at best" proves he fought with Jason's two brothers on the morning of May 20, 2023, and that he had an "ongoing animus" toward Jason before the shooting. But he maintains that no reliable direct or circumstantial evidence, "apart from the

confused, contradictory, false, and uncorroborated testimony of the various Elliot family members," proved he fired the shots as alleged in the indictments. Welker also contends that the physical evidence collected at the scene failed to corroborate the various witness accounts. The jury considered those arguments and rejected them. We find no error in the jury's findings.

The evidence established that Welker repeatedly approached Katanga's house in the days before the shooting to confront Jason, with whom he admits he felt an "ongoing animus." Welker was so threatening that Katanga felt it necessary to obtain a protective order. By 9:00 a.m. on May 20, 2023, Welker was back at Katanga's house and engaged in a fight with Javon and Jaylin. Officer Gribble was dispatched to Katanga's house, arrested Welker, and removed him from the scene, which should have ended the matter. But at around 1:00 p.m., Jason, Javon, Jaylin, and Jayce were gathered at Katanga's when Welker returned. Haskins was outside next door.

The Elliott brothers and Haskins watched Welker and his companion walk up the street, and Javon saw that he held something under a T-shirt he carried. Javon, Jaylin, and Jayce testified that Jason met Welker in the street and asked if he wanted to fight before he and Welker exchanged heated words. Javon, Jaylin, Jayce, and Haskins testified that Welker then suddenly started shooting at Jason. Haskins and Jayce noticed that Welker stood next to the Dodge Dart, on the driver's side, as he fired his gun. Seven shell casings, all brass colored in nature, were found in the street near the Dodge Dart. Haskins insisted that he saw the gun, and Javon and Jaylin heard gunshots and saw muzzle flashes before everyone scattered. Moreover, the Elliott brothers and Haskins all identified Welker in court as the person who fired the gun at Jason. The jury accepted these eyewitness accounts as true and the in-court identification of Welker as accurate, and we are bound by those findings on appeal. *See Little v. Cooke*, 274 Va. 697, 703 (2007) ("We are bound by [these] factual findings unless they are plainly wrong or without evidence to support them.").

It is true that there were inconsistencies in some of the statements rendered by the witnesses. Katanga testified in a prior hearing that she was at home during the shooting, but at trial she admitted she called 911 from the magistrate's office and thus could not have been at home when Welker arrived. Javon conceded that in prior testimony he did not mention a T-shirt and said he only heard gunfire. He also contradicted Katanga's prior testimony by denying that she was at home during the shooting. Jason lied about who returned fire on the day of the offense, taking the blame himself when in reality Howard fired back. And Jaylin admitted he told police he remained inside during the shooting, when, in fact, he was outside and saw the whole thing. The jury was apprised of these inconsistencies and contradictions, and Welker argued their importance to his defense during his closing argument. In the end, the jury resolved those discrepancies in favor of the Commonwealth. Moreover, contrary to Welker's assertion, the eyewitness accounts of all the bystanders were not "inherently suspect and unworthy of belief," but more readily resulted from the fact that nearly ten months went by before Welker was arrested and more than a year passed before the matter went to trial.[4]

It is axiomatic that "[a]t trial, the Commonwealth bears the burden of proving the identity of the accused as the perpetrator beyond a reasonable doubt." *Shahan v. Commonwealth*, 76 Va. App. 246, 258 (2022) (quoting *Cuffee v. Commonwealth*, 61 Va. App. 353, 364 (2013)). Generally, eyewitness identification testimony, standing alone, is sufficient to identify a defendant as the criminal agent unless it is inherently incredible. *Walker v. Commonwealth*, 258 Va. 54, 70-71 (1999). We find nothing inherently incredible in the testimony. The evidence established that there

---

[4] On brief, Welker does not mention his alibi evidence in arguing the sufficiency of the evidence to support his conviction, nor did he mention it in his renewed motion to strike. We therefore need not address it here. In any case, an alibi defense will only be effective "if the alibi, when considered with the whole evidence, raises a reasonable doubt about the defendant's presence at the crime." *Marlowe v. Commonwealth*, 2 Va. App. 619, 624 (1986). Here it does not.

was deep hostility between Jason and Welker leading up to the date of the offense, and after a fight with Jason's brothers on the morning of May 20, 2023, Welker returned to Katanga's house with a gun and there finding Jason, fired upon him. The jury's findings were not plainly wrong or without evidence to support them and will remain undisturbed.

## CONCLUSION

The evidence presented at trial was sufficient to support Welker's convictions for attempted malicious wounding and use of a firearm in the commission of a felony. Thus, we affirm the judgment.

*Affirmed.*