COURT OF APPEALS OF VIRGINIA

PUBLISHED

Present: Judges Beales, Huff and Chaney
Argued at Norfolk, Virginia


JOHN RANDOLPH HOOPER

v.      Record No. 0752-22-1

COMMONWEALTH OF VIRGINIA

OPINION BY
JUDGE RANDOLPH A. BEALES
SEPTEMBER 19, 2023

FROM THE CIRCUIT COURT OF LANCASTER COUNTY
Charles E. Poston, Judge Designate

Jonathan P. Sheldon (Sheldon & Flood, PLC, on briefs), for
appellant.

Virginia B. Theisen, Senior Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.


After a jury trial, John Randolph Hooper was convicted of the felony of involuntary

manslaughter and also of felony hit and run.[1]  On appeal, he argues that "the evidence was

insufficient as a matter of law to prove that Hooper was the operator of the boat at the time of the

accident and so insufficient to prove that he was guilty of either involuntary manslaughter (Va.

Code § 18.2-36.2) or hit and run (Va. Code § 29.1-740)."

I.  BACKGROUND

"In accordance with familiar principles of appellate review, the facts will be stated in the

light most favorable to the Commonwealth, [as] the prevailing party at trial." *Scott v.

Commonwealth*, 292 Va. 380, 381 (2016).  In doing so, the Supreme Court has stated that we, on

appeal, must "discard the evidence of the accused in conflict with that of the Commonwealth,

---

[1] Hooper was originally indicted in the Circuit Court of Lancaster County, but venue was
later transferred to the Circuit Court of the City of Norfolk on motion of the appellant without
objection from the Commonwealth.  Therefore, the record in this case came to us from the
Circuit Court of the City of Norfolk.

and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Parks v. Commonwealth*, 221 Va. 492, 498 (1980) (quoting *Wright v. Commonwealth*, 196 Va. 132, 137 (1954)).

On August 10, 2017, four of John Randolph Hooper's friends came from out of town to stay with him at his parents' home on Carter's Creek while his parents were away on vacation in Africa. Hooper was already at the house with his girlfriend, Willis Blair ("Willis"), when Willis's sister, Winston Blair ("Winston"), arrived at the Hoopers' home with her boyfriend, Ralph Daniel. Video footage from the Hoopers' front-door camera showed that, when Daniel and Winston arrived, Hooper greeted them with a beer already in his hand. The fourth person Hooper invited to stay with him was his longtime friend, Graham McCormick, who flew in from Atlanta.

Winston testified that, once everyone had arrived, Hooper took the group out for a boat ride on his father's twenty-one-foot Boston Whaler.[2] She stated that Hooper continued to drink beer while he was driving the Boston Whaler. Winston also testified that Hooper was the only person who drove the Boston Whaler that afternoon—and that he loaded the Boston Whaler onto the lift at his parents' dock without any assistance. After returning home from the afternoon boat ride, the friends then went out to dinner. Daniel testified that, at dinner, Hooper continued to drink alcohol, consuming two mixed drinks. Daniel also testified that, after everyone returned to the Hoopers' home after dinner, he, McCormick, and Hooper collectively drank three bottles of wine together. At around 10:45 p.m., Willis and Winston went to bed, but Daniel, McCormick, and Hooper walked down to sit on the dock together. Daniel testified that, at around 11:30 p.m., the three men walked inside the house together. Daniel then went to bed, and he saw McCormick walk towards the bedroom in which McCormick was planning to sleep.

---

[2] Hooper's father kept two boats at his dock on the water, a small boat with a blue canopy and the larger Boston Whaler.

After Daniel went to bed, Hooper and McCormick went back down to the dock together. Hooper and McCormick then took the Boston Whaler out for another boat ride. According to Hooper's responses to some previous interrogatories that were admitted into evidence without objection, while the two men were riding in the Boston Whaler that night, Hooper remembered "that the boat hit something hard." Hooper then stated, "I recall immediately turning the boat's engine off, turning its deck light on, and calling out for Graham's name." Hooper said that he "did not see nor hear Graham." Hooper then "restarted the boat's engine and headed to the boat dock up Carter's Creek towards my parent[s'] home there" without McCormick.

Winston testified that she and Daniel woke up together the following morning, and then they met Hooper and Willis in the main area of the house. Willis, Winston, Daniel, and Hooper then walked the dogs together. When they returned, Hooper scheduled tee times at a nearby golf course for the group. Winston stated that Hooper then went to wake up McCormick, but Hooper told her that he discovered that McCormick was not in his bed. Winston went inside McCormick's room and noticed that "[t]here was a bed that nobody had slept in" and that McCormick had "changed out of the salmon shorts that he was wearing the last time I saw him." Winston testified that she then suggested that the group call the police. However, Winston also testified that Hooper told her, "[W]e shouldn't call the police yet" because "maybe Graham had a panic attack" and "called 911 on himself and went to the emergency room." She further stated that Hooper went on to suggest that "maybe he went back outside to call his girlfriend. Maybe he fell. Maybe he's in another room. Maybe he's in the garage."

The friends then called the local hospital to see if Graham McCormick had checked himself in to the hospital. However, the hospital staff confirmed that McCormick was not there. Winston testified that Hooper then suggested that Daniel and Winston should drive to the Tides Inn to search for McCormick while Hooper and Willis would drive to the nearby town of

- 3 -

Kilmarnock to do the same. Winston testified that "nothing was adding up" at that point. While looking at the Boston Whaler, Winston asked Hooper, "Are you sure that that boat did not go back out?" Winston testified that Hooper "had [a] water bottle in his hand, and he started beating the side of it and was like, 'No, no.' And then he walked inside." Winston then called the Sheriff's Office to report that McCormick was missing.

Officers from the Lancaster County Sheriff's Office soon arrived at the Hoopers' home. Detective Steve Sorenson spoke with Hooper. Hooper told Detective Sorenson that he and McCormick "had gone inside about midnight off from the pier where they had been talking, listening to music, and drinking wine and beer." Hooper did not tell Detective Sorenson that he had taken the boat out with McCormick late on the previous night.

In the meantime, Benjamin Woodson, whose home is also located on Carter's Creek, discovered a man floating in a small pool of water between a wooden bulkhead and a collection of rocks and pilings in the creek near his property.[3] Woodson noticed that it was a dead man floating face up in the water and that foam was coming out of the man's mouth and nose. The officers who were at Hooper's home were then notified that a man's body was discovered in the water, and the officers took Winston to Woodson's property. When Winston arrived, she identified the dead man as Graham McCormick.[4]

After McCormick's body was identified, Lancaster County Sheriff's Office Detective Johnny Smithart went back to the Hoopers' residence to speak with Hooper. Hooper told Detective Smithart that, during the prior day, the friends took an afternoon boat ride, then went to dinner, and then the three men went down to the dock after the two women had gone to bed. Hooper told Detective Smithart that the men then "drank some alcohol, talked down there, and

---

[3] A bulkhead is a "retaining wall along a waterfront." *Bulkhead*, *Webster's Third New International Dictionary* (1981).

[4] Medical examiner Dr. Jennifer Bowers testified that McCormick died from drowning.

all of them went upstairs and went to bed." When Detective Smithart asked which boat Hooper took out for the afternoon ride, Hooper pointed to the smaller boat with a blue canopy—not the larger Boston Whaler. Detective Smithart then went down to the dock to look at the smaller boat. Detective Smithart testified that he "didn't notice anything unusual on the dock at that time."

A few days after McCormick's body was discovered near Woodson's property, Woodson noticed that "there was damage to the bulkhead" separating his property from the abutting creek. Woodson stated that the wood on the bulkhead "was split and broken apart." There was also damage to the vinyl and plastic on that bulkhead. Woodson testified that this damage was not there before August 11, 2017.

On August 14, 2017, Detective Smithart and Lieutenant Timothy Self returned to the Hoopers' residence. Lieutenant Self testified that he inspected the Boston Whaler, and he "could detect that there was damage to the fiberglass of the hull on the bottom of the boat." Lieutenant Self also saw damage on the front of the Boston Whaler. Detective Smithart found wood fibers stuck inside the boat's propeller. The officers then collected paint samples from the bottom of the Boston Whaler. At trial, forensic scientist Brenda Christy testified that she compared the Boston Whaler's paint sample with traces of paint left on the bulkhead at Woodson's property. Christy stated that the Boston Whaler's paint matched the paint traces that were left on the bulkhead.

On September 5, 2017, Hooper went with counsel to the Lancaster County Sheriff's Office to speak with Lieutenant Self and Detective Sorenson. After Hooper was given *Miranda* warnings, Hooper finally told the officers that he and McCormick had gone out for a boat ride late that night. *See Miranda v. Arizona*, 384 U.S. 436 (1966). Lieutenant Self testified that Hooper told the officers that "he did not know who was driving the boat." Hooper also told the

officers that "he had had a lot to drink" but that "[w]hat he remembered was there was an impact so hard that it threw him to the floor on the right of the boat." Hooper then "reached up with his left hand and put the boat in neutral." Hooper told the officers that he did not see McCormick, but that he "figured, since he was a good swimmer, that he would swim to shore."

Hooper was charged with felony murder, aggravated involuntary manslaughter, and felony hit and run. At the conclusion of the evidence at trial, Hooper argued in his motion to strike that the Commonwealth had failed to show that he was the operator of the Boston Whaler at the time of the collision. The trial judge granted the motion to strike for felony murder, but the trial judge denied Hooper's motion to strike for manslaughter and hit and run. The jury found Hooper guilty of involuntary manslaughter (a lesser-included offense of aggravated involuntary manslaughter) under Code § 18.2-36.2(A). The jury also found him guilty of felony hit and run under Code § 29.1-740. Hooper now appeals both convictions to this Court.

## II. ANALYSIS

On appeal, Hooper argues that "the evidence was insufficient as a matter of law to prove that Hooper was the operator of the boat at the time of the accident and so insufficient to prove that he was guilty of either involuntary manslaughter (Va. Code § 18.2-36.2) or hit and run (Va. Code § 29.1-740)." "When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is "plainly wrong or without evidence to support it."'" *Secret v. Commonwealth*, 296 Va. 204, 228 (2018) (alteration in original) (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (quoting *Pijor*, 294 Va. at 512) (alteration in original). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)

- 6 -

(quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In addition, "[t]here is no distinction in the law between the weight or value to be given to either direct or circumstantial evidence." *Muhammad v. Commonwealth*, 269 Va. 451, 479 (2005). "Circumstantial evidence is not viewed in isolation. While no single piece of evidence may be sufficient, the combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable mind irresistibly to a conclusion." *Id.*

Code § 18.2-36.2(A) provides that "[a]ny person who, as a result of operating a watercraft or motorboat in violation of clause (ii), (iii), or (iv) of subsection B of § 29.1-738 or a similar local ordinance, unintentionally causes the death of another person, is guilty of involuntary manslaughter." Code § 29.1-738(B)(ii) provides that no person shall operate a watercraft "while such person is under the influence of alcohol." In addition, Code § 29.1-739(A) provides:

> It shall be the duty of the operator of a vessel involved in a collision, accident, or other casualty, so far as he can do so without serious danger to his own vessel, crew, and passengers (if any), to render persons affected by the collision, accident, or other casualty such assistance as may be practicable and as may be necessary in order to minimize any danger caused by the collision, accident, or other casualty, and also give his name, address, and identification of his vessel in writing to any person injured and to the owner of any property damaged in the collision, accident, or other casualty.

"If any person knowingly fails to comply with the provisions of § 29.1-739 when the collision, accident or other casualty results in serious bodily injury to, or the death of, any person, he shall be guilty of a Class 6 felony." Code § 29.1-740.

In this case, Hooper acknowledged in his September 5, 2017 interview with the officers at the Lancaster County Sheriff's Office that he was under the influence of alcohol when his father's Boston Whaler crashed into the bulkhead on Carter's Creek on the night of August 10, 2017. Despite Hooper's claim that he did not remember who operated the vessel, the jury implicitly made the finding of fact that Hooper was the driver of the boat at the time that the

- 7 -

collision occurred. The jury could reasonably infer that Hooper drove the boat late that night, given Winston's testimony that Hooper was the only person who drove the Boston Whaler earlier during the day. In addition, the jury could also reasonably infer that McCormick (who had flown in from Atlanta) would not drive his friend's father's boat at night in waters with which he was not nearly as familiar as Hooper was. Furthermore, the jury could reasonably infer from the totality of the evidence, including Hooper's deceptive conduct and lies to the police and to his friends about McCormick's disappearance, described *supra*, that Hooper was driving the boat at the time of the collision. *See Inge v. Commonwealth*, 217 Va. 360, 366 (1976) ("[I]t is within the province of the jury to determine what inferences are to be drawn from proved facts, provided the inferences are reasonably related to those facts.").

Hooper's statements to his friends and to law enforcement following the boat's collision with the bulkhead (and following McCormick's disappearance and death) demonstrate Hooper's consciousness of guilt. *See Rams v. Commonwealth*, 70 Va. App. 12, 27 (2019) ("[T]he fact finder may conclude regarding even a non-testifying defendant that his false statements establish that he has lied to conceal his guilt."). After the group determined the next morning that McCormick was missing, Hooper gave Winston a series of excuses as to why the group should not call the police to help search for McCormick. When Winston asked Hooper, "Are you sure that that boat did not go back out," Winston testified that Hooper "had [a] water bottle in his hand, and he started beating the side of it." Winston testified that Hooper then told her, "'No, no.' And then he walked inside." Hooper also diverted Detective Smithart's attention away from the larger Boston Whaler when Hooper lied by telling Detective Smithart that the group had taken the smaller boat out for a ride during the afternoon of August 10, 2017.

In addition, the jury could also reasonably infer that Hooper was lying to conceal his guilt when he told Detective Sorenson and Lieutenant Self that he did not remember who drove the

- 8 -

boat at the time of the incident. Hooper told an officer that he remembered that the three men drank more wine and beer together on the dock before Hooper and McCormick went riding on the boat late that night for the second boat ride on that day. According to Hooper's own answers to interrogatories, Hooper also remembered "that the boat hit something hard," and then he further remembered calling out for McCormick (after McCormick apparently had fallen out of the boat). Hooper also told Detective Sorenson and Lieutenant Self that he likewise remembered thinking to himself that McCormick "was a good swimmer, that he would swim to shore." In his answers to previous interrogatories, Hooper also further remembered that he "restarted the boat's engine and headed to the boat dock up Carter's Creek towards my parent[s'] home" where he loaded the Boston Whaler on a boatlift on his parents' dock—exactly as he had done earlier that afternoon. As Hooper has acknowledged remembering a number of details about what happened that night, the jury could therefore reasonably conclude that Hooper feigned memory loss when he conveniently forgot an essential detail of the incident—i.e., whether he was driving the boat when it hit the bulkhead. Consequently, given Hooper's familiarity with driving his father's Boston Whaler and given Hooper's statements to his friends and to law enforcement, we certainly cannot say that the jury was plainly wrong or without credible evidence in determining that Hooper was the driver of the boat at the time of the collision that resulted in Graham McCormick's death.

Given that Hooper acknowledged that he had been drinking a lot, given that he was clearly under the influence of alcohol while he drove his father's boat into a bulkhead, and given that Graham McCormick died as a result of being thrown from the boat into the water after this collision with the bulkhead, we certainly cannot say that no rational factfinder could have found the evidence sufficient to support Hooper's conviction of involuntary manslaughter under Code § 18.2-36.2(A). Furthermore, given that Hooper left the scene of the collision (in violation of

- 9 -

Code § 29.1-739(A)) and drove the boat back to his parents' home after he crashed the boat into a bulkhead next to Woodson's property and given that McCormick died as a result of this collision, we certainly cannot say that no rational factfinder could have found the evidence sufficient to support Hooper's conviction of felony hit and run under Code § 29.1-740.

III. CONCLUSION

In short, there is plenty of credible evidence in the record to support the jury's finding of fact that Hooper was driving the boat when it hit a bulkhead late at night when McCormick was thrown overboard and then drowned in the waters of Carter's Creek. Who was driving the boat is a finding of fact, and there is certainly credible evidence in the record to support the jury's implicit finding that Hooper was driving it. Only Hooper drove the boat on the long first outing of the day, even though he had been drinking and had four other people on the boat to help him drive it. He knew his father's big Boston Whaler and knew the waters of Carter's Creek while Graham McCormick (from Atlanta) did not know either nearly as well. Hooper lied to the police and to his friends that he did not take the boat out again around midnight late that night. Hooper also lied to the police that he and his friends had only taken the smaller boat out earlier that day (not the bigger, now-damaged Boston Whaler). Hooper told his friends all sorts of different, often bizarre reasons why they should not call the police and report Graham McCormick as missing, such as that maybe McCormick had had a panic attack and checked himself into a local hospital, that maybe he had fallen off the dock, or that maybe he had just gone into another room or was in the garage. Consequently, for all of these reasons, we certainly cannot say that no rational factfinder could have found the evidence sufficient to uphold Hooper's conviction for involuntary manslaughter under Code § 18.2-36.2(A). In addition, given that Hooper had admitted that he drove the boat back to his parents' home after its collision with a bulkhead that led to the disappearance and death of Graham McCormick in the waters of Carter's Creek, we

certainly cannot say that no rational factfinder could have found the evidence also sufficient for Hooper's conviction for felony hit and run under Code § 29.1-740.

Therefore, for all of the foregoing reasons, we do not disturb the jury's findings and Hooper's convictions in the trial court.

*Affirmed.*