COURT OF APPEALS OF VIRGINIA

Present:   Chief Judge Decker, Judges AtLee and Bernhard
Argued by videoconference

UNPUBLISHED

RAYMOND MATTHEW UTTARO

MEMORANDUM OPINION* BY
v.        Record No. 1379-24-3            CHIEF JUDGE MARLA GRAFF DECKER
SEPTEMBER 30, 2025
COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF NELSON COUNTY
Michael R. Doucette, Judge

Dana R. Cormier (Dana R. Cormier, P.L.C., on briefs), for appellant.

Liam A. Curry, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Raymond Matthew Uttaro appeals his eighteen convictions, rendered in a jury trial, for

sexual and drug offenses involving a minor in his care, in violation of Code

§§ 18.2-48, -63, -67.1, -67.2, -67.3, -67.4:2, and -255. He raises both evidentiary-admissibility and

sufficiency-of-the-evidence claims. First, he challenges the trial court's ruling excluding the results

of a screening report prepared while the victim was on juvenile probation. Second, he suggests that

the evidence was insufficient to support his convictions for two reasons. He challenges all of his

convictions on the ground that the victim's testimony was inherently incredible as a matter of law.

He further contends that the evidence failed to support eight of his convictions because it did not

prove that he accomplished the acts through force, threat, or intimidation. We hold the trial court

did not err and affirm Uttaro's convictions.

---

* This opinion is not designated for publication. *See* Code § 17.1-413(A).

BACKGROUND[1]

The offenses against the victim, A.L., occurred when he was between eleven and fifteen years old. When he was about ten and Uttaro was about fifty-seven, A.L.'s mother introduced Uttaro to him as an old family friend. A.L. was "having a hard time" after the death of his stepfather. Uttaro, who lived nearby, agreed to "spend . . . time with him."

After A.L. turned eleven, he started going to Uttaro's house on weekends and during school breaks. Uttaro became a father-figure and engaged in a variety of activities with him. He also began sexually abusing A.L. by "grabbing" his penis while A.L. was bathing. A.L. tried covering his penis with a rag because he did not want to be touched, but Uttaro touched him anyway. When A.L. later switched to showering, Uttaro got into the shower with him and forced him to perform fellatio. Around the same time, Uttaro began giving A.L. oxycodone and trazodone after the "shower incident[s]." A.L. did not want the abuse to happen, but it continued every weekend that he went to Uttaro's house.

The Covid-19 pandemic began in March 2020 when A.L. was thirteen. At that time, Uttaro encouraged A.L. to stay at his home so that he would have a quiet place for his virtual schooling. By the fall of 2020, A.L. was spending weekdays at Uttaro's and weekends at his mother's house. Sometime that year, Uttaro "escalate[d]" his abuse. He gave A.L. an oxycodone, penetrated A.L.'s anus with his penis, and then gave A.L. a second oxycodone. A few days later, he pointed a pistol he always carried at A.L.'s head and said, "[I]f you tell anyone, bang."

---

[1] "On appeal, this Court consider[s] the evidence and all reasonable inferences flowing from that evidence in the light most favorable to the Commonwealth, the prevailing party at trial." *Nelson v. Commonwealth*, 73 Va. App. 617, 620 n.1 (2021) (alteration in original) (quoting *Chenevert v. Commonwealth*, 72 Va. App. 47, 52 (2020)).

When A.L. was fourteen, Uttaro began performing fellatio on him, always giving him an oxycodone or trazodone beforehand. On one occasion, Uttaro gave A.L. an oxycodone and told him they would play a game. He then handcuffed A.L. to the bed and performed fellatio on him.

While A.L. was still attending school virtually during the pandemic, he started living primarily at Uttaro's house because his mother moved out of the county and he did not want to leave his friends or lose access to the drugs Uttaro was giving him. At that time, A.L. was also using marijuana, and the Nelson County Department of Social Services (DSS) investigated Uttaro several times because A.L. repeatedly tested positive for that substance.

After A.L. turned fifteen in August 2021, Uttaro continued to sexually abuse him in the shower, give him oxycodone, and penetrate him anally. Also around that time, Uttaro again threatened him "by putting [his] gun up and saying bang." As Uttaro prepared to "file for custody" due to A.L.'s mother's move, A.L. was feeling "[v]ery conflicted" because Uttaro was supposed to be his "guardian" but was instead "an evil person." "[T]ired of" the abuse, A.L. tried unsuccessfully to shoot Uttaro and himself with one of Uttaro's guns. In separate incidents, A.L. also stole a gun from Uttaro, used a hammer to fight with him over marijuana, and ran away. A.L. testified that his drug addiction, fed by Uttaro, "was really bad" at that time. Uttaro reported A.L.'s behavior, which led to juvenile probation, court-ordered counseling, and drug testing.

In that same time frame, A.L. was engaging in various types of self-harm, including abusing drugs, cutting himself, and attempting suicide. At trial, A.L. explained that he was having flashbacks and nightmares and had reached a breaking point regarding Uttaro's sexual abuse. He was removed from Uttaro's care and placed in the care of DSS. A.L. conceded he testified at Uttaro's preliminary hearing that he kept going back to live with him because he provided A.L. with "a safe place" to live. But he explained that he followed that statement with,

"I guess not really." He also admitted that he kept going back because he had a "really bad" drug addiction and "liked the drugs."

DSS placed A.L. in a series of treatment centers. In February 2023, he was admitted to the Three Rivers Treatment Facility. When Uttaro visited A.L. in a monitored conference room there in July 2023, he directed A.L. to put his foot on Uttaro's inner thigh close to his penis. Uttaro got an erection, told A.L. not to "tell anyone," and went to the bathroom while he still had the erection. Two employees at Three Rivers saw Uttaro's erection and ended the visits. In the week that followed, A.L. reported to the therapist overseeing his care at Three Rivers, as well as a DSS social worker, that Uttaro had repeatedly abused him. After he told his therapist about the abuse, his nightmares "decreased a lot." He testified that he reported the abuse because his visits with Uttaro had been cancelled and he finally felt safe.

Uttaro testified in his own defense and denied all of the criminal acts about which A.L. and the Three Rivers staff testified. He admitted he had a prior conviction for embezzlement.

The jury convicted Uttaro of eighteen criminal offenses involving A.L.[2] He was sentenced to 4 life terms, 124 years in prison with 99 years suspended, and 12 months in jail with 12 months suspended.

ANALYSIS

Uttaro challenges his convictions by contesting the admissibility of certain evidence and specific aspects of the sufficiency of the evidence supporting his numerous convictions. First, he

---

[2] Uttaro was convicted of one count each of seven offenses: sexual battery of a child thirteen or fourteen years old; aggravated sexual battery of a child thirteen or fourteen by force, threat, or intimidation; aggravated sexual battery using force, threat, or intimidation and resulting in serious bodily or mental injury; forcible sodomy of a child under thirteen; carnal knowledge of a thirteen year old; carnal knowledge of a fourteen year old; and abduction of a child under sixteen with intent to defile. He was convicted of two counts each of aggravated sexual battery of a child under thirteen and object sexual penetration by force, threat, or intimidation. The jury also convicted Uttaro of three counts of forcible sodomy by force, threat, or intimidation. Finally, he was convicted of four counts of distributing a Schedule I or II substance to a minor.

contends the trial court erred by excluding the results of a screening report concerning A.L. that was prepared while A.L. was on juvenile probation. Second, he suggests certain reasons why the evidence was insufficient to support his convictions.

   I. Admissibility of Excerpt from A.L.'s Youth Assessment and Screening Instrument

Before trial, Uttaro made a motion *in limine* to permit him to offer into evidence part of a report prepared while A.L. was on juvenile probation for various property crimes. He argued that a specific portion of the report, the Youth Assessment and Screening Instrument (YASI), was "a critical piece of impeachment" because A.L.'s "psychological profile . . . suggest[ed] his inability to be truthful." He pointed to A.L.'s statements that he was "proud of" his "problem behavior," "indifferent" regarding its effect on his victims, "resent[ful of] authorities," and unlikely to change to "live in a law-abiding manner." Yet even in making the motion, Uttaro acknowledged that his evidentiary request was "on a little bit [of a] slippery slope."

The trial court denied the motion. It concluded that "the statements . . . made in response to the YASI . . . sa[id] nothing about truthfulness" and instead "talked about bravado" and "lack of empathy." The court in fact characterized one interpretation of the statements as "the epitome of truthfulness" because A.L. was "saying all th[o]se bad things about him[self]." The court added that the YASI was not conducted to diagnose mental health issues and was instead done for purposes of probation.

Uttaro contends that the trial court erred by refusing to allow him to introduce the results of the YASI into evidence to impeach A.L. "When reviewing a trial court's decision to admit or exclude evidence, [appellate courts] apply an abuse of discretion standard. In this context, '[the reviewing court] do[es] not substitute [its] judgment for that of the trial court. Rather, [it] consider[s] only whether the record fairly supports the trial court's action.'" *Bista v. Commonwealth*, 303 Va. 354, 370 (2024) (citation omitted) (quoting *Kenner v. Commonwealth*,

299 Va. 414, 423 (2021)). The "bell-shaped curve of reasonability" underpinning appellate review for an abuse of discretion "rests on the venerable belief that the judge closest to the contest is the judge best able to discern where the equities lie." *Commonwealth v. Barney*, 302 Va. 84, 94 (2023) (quoting *Sauder v. Ferguson*, 289 Va. 449, 459 (2015)). This Court will hold a trial court abused its discretion only when "reasonable jurists could not differ" as to the correct result. *See Hicks v. Commonwealth*, 71 Va. App. 255, 275 (2019) (quoting *Campos v. Commonwealth*, 67 Va. App. 690, 702 (2017)).

At trial, of course, "[t]he proponent of the evidence bears the burden of establishing [by a preponderance] . . . the facts necessary to support its admissibility." *Church v. Commonwealth*, 71 Va. App. 107, 122 (2019) (third alteration in original) (quoting *Perry v. Commonwealth*, 61 Va. App. 502, 509 (2013)). The trial court makes any necessary findings about these facts "as part of its decision regarding whether to admit or exclude the proffered evidence. Such subsidiary findings are binding on appeal 'unless "plainly wrong" or without evidence to support them.'" *Hicks*, 71 Va. App. at 275 (citation omitted) (quoting *Campos*, 67 Va. App. at 702). But if "the admissibility determination involves a question of law," that issue is reviewed de novo. *Id.* at 276.

Uttaro argues that the YASI results "indicated . . . that A.L. ha[d] a bad general reputation for truth" and specifically, among other things, that he was "proud of" and "unconcerned" by "his problem behavior." As a result, Uttaro suggests that this evidence was probative of A.L.'s credibility and admissible under either Virginia Rule of Evidence 2:608 or 2:607(a)(viii) because it had "a logical tendency to convince the trier of fact that A.L.'s . . . sincerity or veracity . . . [wa]s questionable."

Rule 2:608(a) authorizes impeachment based on a witness's bad reputation for truth by a person with "sufficient familiarity with the reputation to make the testimony probative." The

rule generally does not permit the admission of evidence of *specific acts* showing untruthfulness. Rule 2:608(b). Rule 2:607(a)(viii) authorizes impeachment, subject to certain exceptions, by "any other evidence" that is "probative on the issue of credibility because of a logical tendency to convince the trier of fact . . . that the sincerity or veracity of the witness is questionable."

The language in the YASI that Uttaro quoted to the court in his motion was that the "problem behavior" about which "A.L. [wa]s proud" and "unconcerned" was three counts each of breaking and entering, destruction of property, and petty larceny for "related break-ins at a . . . grocery store," as well as the theft of a firearm from Uttaro. The juvenile court "found facts sufficient" to believe A.L. committed those offenses, but defense counsel proffered it "d[id] not appear" that the juvenile court "ha[d] yet entered any final disposition orders." Although some or all of this criminal conduct could provide a basis for impeachment under a different evidentiary rule, Rule 2:609, if it resulted in an *adult* conviction (which it did not here), it did not constitute a finding that A.L. had a bad reputation for truthfulness for purposes of Rule 2:608.[3] *See* Rule 2:609(b)-(c); *Thomas v. Commonwealth*, 279 Va. 131, 154 (2010) (explaining that juvenile adjudications may not be used for general impeachment unless the Confrontation Clause requires it to "show bias or motivation of a prosecution witness to give testimony favorable to the government").

Further, as found by the trial court, the remaining proffered language from the YASI simply does not support a finding that A.L. had a reputation for being untruthful. As argued by defense counsel, the YASI report noted that A.L. was "indifferent to the effect on, and obligation toward[,] the victims of his behavior," "completely lack[ed] empathy for others," and was "non-committal towards making amends." The report added that A.L. "expresse[d] resentment

---

[3] The trial court separately ruled that evidence of A.L.'s theft of Uttaro's firearm was admissible on the subject of bias.

towards authorities," "show[ed] no awareness that his actions c[ould] have consequences," and "fe[lt] he d[id] not need to [change or] live in a law-abiding manner." As the trial court concluded, A.L.'s statements "s[aid] nothing about [un]truthfulness" and "talked [instead] about bravado . . . [and] lack of empathy."[4] According to the court, the responses "could [in fact] be the epitome of truthfulness, because [A.L. wa]s saying all these bad things about him[self]." These findings were not plainly wrong.

Consequently, the trial court did not abuse its discretion by refusing to admit the proffered portion of the YASI to prove under Rule 2:608 that A.L. had a bad reputation for truthfulness or to attack his sincerity or veracity under Rule 2:607(a)(viii).

## II. Sufficiency of the Evidence

Uttaro contends that the evidence is insufficient to support his convictions for two reasons. First, he argues that the testimony of A.L. was "inherently unreliable." Second, he alleges regarding the offenses requiring proof of "force, threat, or intimidation" that the evidence failed to prove this element. In considering these issues, this Court is guided by well-established legal principles.

"[W]hen reviewing whether the evidence was sufficient to convict a defendant of a criminal offense, an appellate court has a 'limited' role . . . ." *Commonwealth v. Wilkerson*, ___ Va. ___, ___ (Feb. 20, 2025) (quoting *Commonwealth v. Garrick*, 303 Va. 176, 182 (2024)). This Court "must 'examine the evidence that supports the conviction and allow [it] to stand unless [the determination of the trier of fact] is plainly wrong or [the conviction is] without evidence to support it.'" *Cornell v. Commonwealth*, 76 Va. App. 17, 28 (2022) (quoting *Austin*

---

[4] Defense counsel's written motion referred to additional "evidence from other witness[e]s regarding A.L.'s general bad reputation for truth" and contended it, too, "[wa]s admissible pursuant to Rule 2:608." Even so, he did not proffer any additional specific evidence, so this Court does not consider that allegation. *See Murray v. Commonwealth*, 71 Va. App. 449, 460 (2020).

*v. Commonwealth*, 60 Va. App. 60, 65 (2012)).  And the appellate court "gives deference to the . . . finding[s] of witnesses' credibility" made by the fact finder "and 'will not seek to pass upon the credibility of the witnesses where their evidence is not inherently incredible.'"  *Sample v. Commonwealth*, 303 Va. 2, 16 (2024) (quoting *Gerald v. Commonwealth*, 295 Va. 469, 486 (2018)).

The only relevant question on appeal "is, after reviewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact," in this case the jury, "could have found the essential elements of the crime beyond a reasonable doubt."  *Commonwealth v. Barney*, 302 Va. 84, 97 (2023) (quoting *Sullivan v. Commonwealth*, 280 Va. 672, 676 (2010)).  "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact . . . .'"  *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

### A.  Inherent Incredibility of A.L.'s Testimony

Uttaro posits that A.L.'s testimony is "inherently unreliable."  He emphasizes how long it took for A.L. to report the abuse, which he characterizes as almost six years, and the "extraordinary number of opportunities" A.L. had to do so in light of the various social services and juvenile delinquency investigations in which A.L. was involved.  Uttaro points to A.L.'s "open[] express[ions of] love and admiration" for him and his repeated decisions to return to Uttaro's house when he could have lived with his mother or in foster care.  Finally, Uttaro argues that A.L. made conflicting statements about why he did not report the abuse sooner.  He relies on A.L.'s suggestion that "he felt threatened and intimidated by" Uttaro despite hitting Uttaro with a hammer during a fight.  He further notes A.L.'s statement that he "liked the drugs" Uttaro gave him.

- 9 -

"To be 'incredible,' testimony 'must be either so manifestly false that reasonable men ought not to believe it, or it must be shown to be false by objects or things as to the existence and meaning of which reasonable men should not differ.'" *Lambert v. Commonwealth*, 70 Va. App. 740, 759 (2019) (quoting *Juniper v. Commonwealth*, 271 Va. 362, 415 (2006)). "A legal determination that a witness is inherently incredible is very different from the mere identification of inconsistencies in a witness'[s] testimony or statements. Testimony may be contradictory or contain inconsistencies without rising to the level of being inherently incredible as a matter of law." *Kelley v. Commonwealth*, 69 Va. App. 617, 626 (2019). As such, "'[p]otential inconsistencies in testimony are resolved by the fact finder,' not the appellate court." *Id.* (alteration in original) (quoting *Towler v. Commonwealth*, 59 Va. App. 284, 292 (2011)). And the fact finder "is free to believe or disbelieve, in whole or in part, the testimony of any witness." *Rams v. Commonwealth*, 70 Va. App. 12, 38 (2019). Simply put, the fact finder's conclusions about witness credibility "will not be disturbed on appeal unless plainly wrong." *Smith v. Commonwealth*, 56 Va. App. 711, 718 (2010).

It is axiomatic that proof of rape or sexual abuse may be established solely on the uncorroborated testimony of the victim as long as it is not inherently incredible. *See Nobrega v. Commonwealth*, 271 Va. 508, 519 (2006); *Corvin v. Commonwealth*, 13 Va. App. 296, 299 (1991). "The mere fact that a witness may have delayed in reporting knowledge of a case or given inconsistent statements during the investigation of a crime does not necessarily render the testimony unworthy of belief." *Juniper*, 271 Va. at 415. A victim's "failure to report . . . for an unreasonably long period casts 'suspicion and doubt' on the victim's testimony, 'unless there is a credible explanation for such delay.'" *Wilson v. Commonwealth*, 46 Va. App. 73, 88 (2005) (quoting *Willis v. Commonwealth*, 218 Va. 560, 563 (1977)). But a victim's explanation that he was afraid of his abuser and "embarrass[ed] at what was happening to h[im]," if accepted by the jury, can provide just such a credible explanation. *Id.*; *see Love v. Commonwealth*, 18 Va. App.

84, 85, 89-90 (1994) (holding that the thirteen-year-old victim's seven-year delay in reporting ongoing sexual abuse that began when she was five did not render her testimony inherently incredible). Simply put, when a victim gives the jury a reasonable explanation for the delay in reporting, that explanation provides a basis for the jury to conclude the victim's testimony is credible. *See Love*, 18 Va. App. at 89-90.[5]

The instant jury, sitting as the trier of fact, accepted A.L.'s testimony as credible. Its conclusion may not be overturned on appeal because his testimony was not, as a matter of law, "inherently incredible[] or so contrary to human experience as to render it unworthy of belief." *See Johnson v. Commonwealth*, 58 Va. App. 303, 315 (2011) (quoting *Robertson v. Commonwealth*, 12 Va. App. 854, 858 (1991)). *See generally Juniper*, 271 Va. at 415 (defining "incredible"). The jury resolved any concerns about A.L.'s seemingly inconsistent behavior and delay in reporting the abuse based on its acceptance of his testimony explaining why he continued to go back to Uttaro's home and subject himself to the sexual abuse.

A.L.'s biological father physically abused him until his parents' relationship ended when he was about five years old. It was undisputed that when A.L. met Uttaro, his home life was disruptive and his mother was emotionally and possibly physically abusive toward him. A.L. conveyed, both directly and indirectly, that he was conflicted about his feelings for Uttaro, who served as a father figure to him over the course of several years. A.L. also relayed that he had been taught in military school to "follow . . . authority figures" and everyone said Uttaro was "a good guy." During the abuse, Uttaro repeatedly told A.L. "it's all right" and "not to tell."

---

[5] Other decisions from this Court have reached similar conclusions. *See Smith*, 56 Va. App. at 719 (recognizing that a jury can accept a "'victim's youth, fright and embarrassment [as] . . . an acceptable explanation' for a victim's otherwise unexplainable statements or actions" (quoting *Corvin*, 13 Va. App. at 299)); *Brown v. Commonwealth*, 37 Va. App. 169, 171, 173 (2001) (holding that a preteen's almost two-year delay in reporting her grandfather's sexual abuse was explained by her testimony that he "told her not to tell," she "didn't think anybody w[ould] believe [her]," and "she felt scared and threatened").

A.L. further explained that he was embarrassed about the homosexual nature of the abuse, worried he would be blamed for allowing it, and afraid of what Uttaro would do to him if he reported it. He elaborated that Uttaro was significantly larger than him and threatened him with a gun twice after the abuse was underway. Finally, A.L. said that he was addicted to the drugs to which Uttaro introduced him to make his commission of the abuse easier. That addiction likely also helped A.L. mask the psychological pain stemming from the abuse and related threats for longer than he otherwise might have.

The jury could certainly conclude, as A.L. testified, that he finally confirmed the years of sexual abuse to his therapist and social worker because staff members at the mental health facility where he was a patient witnessed the abuse and terminated contact visits with Uttaro as a result of what they saw.[6] The jury also had the benefit of the testimony of two staff members that Uttaro had a visible erection during that visit, corroborating A.L.'s account of it. *See Lambert*, 70 Va. App. at 760 (holding that corroborated testimony was not inherently incredible).

Notably, Uttaro, who had previously been convicted of embezzlement, chose to testify in his own defense. As a result, the jury could compare its assessment of A.L.'s credibility directly to Uttaro's. It was entitled to reject Uttaro's denials—including his claims that the two Three-Rivers staff members who saw the abuse and his resulting erection were lying—and to accept A.L.'s recounting of the ongoing abuse. *See, e.g.*, *Cornell*, 76 Va. App. at 30 (providing that the fact finder could consider the sexual abuse victim's testimony and the defendant's denials and conclude that

---

[6] The social worker testified without objection that she had strongly suspected Uttaro was sexually abusing A.L. When she spoke to Uttaro about why he hoped to regain custody, Uttaro described his relationship with the adolescent in a way that one would "talk[] about . . . a spouse as opposed to a child," saying they enjoyed "cooking together," "doing yard work together," and "just . . . being together." This concerned the social worker, but she "never pressed [A.L.] about" it because he needed to be allowed to reveal it "on his own."

the defendant "l[ied] to conceal his guilt" (quoting *Flanagan v. Commonwealth*, 58 Va. App. 681, 702 (2011))).

On these facts, A.L.'s testimony was not inherently incredible as a matter of law, and the jury was entitled to rely on it to find Uttaro guilty of the eighteen offenses for which he was convicted.

### B. Sufficiency of the Evidence to Prove Force, Threat, or Intimidation

Uttaro challenges eight of his convictions on the ground that the evidence was insufficient to prove he perpetrated the specific acts using "force, threat, or intimidation." He contests his convictions for three counts of forcible sodomy, two counts each of object sexual penetration and aggravated sexual battery, and one count of abduction with intent to defile. *See* Code §§ 18.2-48, -67.1, -67.2, -67.3. Significantly, though, the prosecutor did not seek to prove the challenged offenses based on force. Instead, he argued that the evidence proved intimidation or threat.[7] The evidence, viewed under the proper standard, proved this element for each of the crimes.[8]

---

[7] The form of object sexual penetration at issue can be proved through force, threat, or intimidation *or "the [victim]'s mental incapacity or physical helplessness."* *See* Code § 18.2-67.2(A)(2) (emphasis added). Although the applicable verdict forms listed this option, the corresponding jury instructions did not, so the Court examines the sufficiency of the evidence to prove those offenses using intimidation or threat as argued by the prosecutor. *See Durham v. Commonwealth*, 303 Va. 310, 322 n.2 (2024) (noting that appellate courts should "decide cases on the best and narrowest ground[] available" (emphasis omitted) (quoting *Commonwealth v. Swann*, 290 Va. 194, 196 (2015))).

[8] One of the challenged offenses—abduction—requires proof of force, *deception*, or intimidation, *see* Code §§ 18.2-47 to -48, *not* force, *threat*, or intimidation, as the other challenged offenses do. But the Commonwealth relied on evidence of intimidation to establish all of the offenses, a method of proof common to them all. As a result, we hold that analyzing the sufficiency of the evidence on the intimidation prong, without evaluating a possible procedural bar, provides the best and narrowest ground for resolving the challenge to the abduction conviction. *See Durham*, 303 Va. at 322 n.2.

Intimidation involves "putting a victim in fear of bodily harm by exercising such domination and control of h[im] as to overcome h[is] mind and overbear h[is] will. I[t] may be caused by the imposition of psychological pressure on one who, under the circumstances, is vulnerable and susceptible to such pressure." *Sutton v. Commonwealth*, 228 Va. 654, 663 (1985).

As for proving "intimidation," the "fear of bodily harm must derive from some conduct or statement of the accused." *Cairns v. Commonwealth*, 40 Va. App. 271, 294 (2003) (quoting *Sabol v. Commonwealth*, 37 Va. App. 9, 18 (2001)). Even so, the bodily harm feared need not be of a type "other than the harm inherent in the sexual assault" itself. *Id.* (quoting *Commonwealth v. Bower*, 264 Va. 41, 46 (2002)). And it "need not be so great as to result in terror, panic, or hysteria." *Sutton*, 228 Va. at 663 (quoting *Intimidation*, *Black's Law Dictionary* (5th ed. 1979)).

In assessing whether a victim "was put in fear of bodily harm," "relevant matters" include "the victim's age, the relative size of the defendant and victim, the familial relationship between the defendant and victim, and the vulnerable position of the victim." *Bower*, 264 Va. at 46. Also, whether the victim was in a vulnerable position may take into account his "relative isolation from others." *Clark v. Commonwealth*, 30 Va. App. 406, 411 (1999).

Threat, another method of proving the contested element of seven of the offenses at issue here, "means [the] expression of an intention to do bodily harm or to use force." *See* Model Jury Instrs.—Crim. No. 48.670. For example, where a defendant "display[s] and cock[s] . . . [a] revolver[,] in conjunction with [a] statement that [the victim] must comply 'or else,'" the evidence "is sufficient for a reasonable factfinder to conclude that [the defendant] caused [the victim] to engage in the conduct under the threat of bodily harm." *Massie v. Commonwealth*, 74 Va. App. 309, 323 (2022). But even as to crimes that do not include threat as a method of

- 14 -

proving this element—here the abduction offense—evidence of threat can prove intimidation, the method of commission that all the offenses here do share. *See* Code §§ 18.2-47 to -48; *see Seaton v. Commonwealth*, 42 Va. App. 739, 754-55 (2004) (describing threat as a "subspecies of intimidation").

In Uttaro's case, evidence of intimidation establishes the challenged element of the eight offenses at issue. And when the abuse was already underway, Uttaro twice threatened A.L. with a gun if he told anyone about the abuse. Because the abuse was ongoing, these threats, at a minimum, served as additional evidence of intimidation with regard to the offenses that occurred after the date of each threat.

A.L. was thirteen to fifteen years old when the abuse requiring proof of force, threat, or intimidation occurred. But Uttaro began the abuse when A.L. was only eleven, having met the child when he was just ten. Photographic evidence confirmed that A.L. was considerably smaller than Uttaro when the abuse first started, and A.L. testified at trial that while the abuse continued, he was "still little" and Uttaro was "twice [his] size" and "so strong." A.L. also explained that he had been taught at his military academy "to follow [his] authority figures," and clearly Uttaro was such a figure to him.

The evidence provided context to the relationship. It also established that the victim, A.L., had been abused by others before he met Uttaro. He was physically abused by his biological father before he was five years old, which contributed to his parents' break-up and the partial or total loss of his first father figure. A.L. described his mother as emotionally abusive and said he "hated" her as a result. After his parents broke up, his mother married another man, who died when A.L. was about ten, resulting in the loss of his second father figure. When A.L. was having difficulty after his stepfather's death, Uttaro agreed to "spend . . . time with him." Uttaro visited A.L. at his home, took him fishing, and allowed him to play with things at Uttaro's

- 15 -

home like his golf clubs and his tractor. He also visited A.L. at his military school. Uttaro "didn't push [A.L.] as hard as a regular parent might push him" but "considered A[.L. his] child."

So Uttaro had solidified himself as a father figure to A.L. by the time he began abusing the child at age eleven, touching A.L.'s penis while he was in the bathtub at Uttaro's home and telling him that what he was doing was "all right." A.L. tried to protect himself in the way a child might, covering his penis with a rag, but Uttaro touched him anyway. As to Uttaro's sexual abuse, A.L. explained that he "d[id]n't really know" why he did not tell his mother, but he surmised he was "scared that she would judge" him. He was also "afraid of being judged" by people at the military academy if he told them about the abuse. When Uttaro escalated the abuse by forcing twelve-year-old A.L. to commit fellatio on him in the shower, he kept saying, "It's all right," and, "Nothing[ would] go wrong." The drug abuse further explained A.L.'s behavior. Uttaro began giving A.L. oxycodone and trazodone, and he did so routinely after the shower incidents. A.L. testified that he did not tell anyone about the abuse in the shower because he was "told not to tell," he was "scared" of Uttaro, and his mother and others kept saying Uttaro was "a good person."

As a result, by the time A.L. turned thirteen and the crimes for which proof of force, threat, or intimidation began to occur, Uttaro had already established a pattern of intimidation— "exercising such domination and control o[ver A.L.] as to overcome h[is] mind and overbear h[is] will." *See Sutton*, 228 Va. at 663. That pattern of intimidation allowed him to continue abusing A.L. Because A.L.'s previous father figures were unavailable to him and A.L.'s mother, who had three younger children, had previously emotionally abused him, Uttaro occupied a position as the person upon whom A.L. could most rely, except, of course, for the abuse. A.L. initially agreed that he kept going back to live with Uttaro because he provided A.L. with "a safe

place" to live. Nevertheless, A.L. acknowledged that this statement was "not really [true]." In other words, A.L. made plain that he viewed Uttaro's home as a place of *relative* safety. *See Cairns*, 40 Va. App. at 295 (noting that the defendant was the stepfather of one of the victims); *Clark*, 30 Va. App. at 410-11 (noting that the defendant was the victim's father, who was her primary caregiver, and she feared others would "reject her" if she told).

Then, when A.L. was still thirteen, the pandemic began, and at Uttaro's urging, A.L. began spending weekdays at Uttaro's home so that he could attend school virtually without interruption. Although A.L. was still going to his mother's on the weekends, his contact with her was reduced, placing him in a more vulnerable position based on his "relative isolation from others." *See Clark*, 30 Va. App. at 411. Uttaro used this opportunity to escalate the abuse, giving A.L. an oxycodone and then sodomizing A.L. anally. The anal penetration hurt, but A.L. felt "conflicted" because "everyone" told him that Uttaro "was a good guy," so instead of "crying out for help," he "put[] on a mask." Just a few days later, Uttaro, who was very familiar with firearms, pointed a pistol at A.L.'s head and said, "[I]f you tell anyone, bang." A.L. testified expressly that this threat deterred him from reporting the ongoing abuse. As a result, it served as an additional factor in proving Uttaro "dominat[ed] and control[led]" A.L. in a way that "overc[a]me h[is] mind and overb[ore] h[is] will." *See Sutton*, 228 Va. at 663.

As Uttaro again escalated the abuse by continuing to give A.L. drugs and beginning to perform fellatio on him, A.L. became increasingly isolated because his mother moved away and gave Uttaro custody. A.L. testified that he "still remember[ed]" Uttaro's act of pointing the pistol at him and threatening him, and Uttaro continued saying, "Don't tell anyone." A.L. felt "worth[less]" and thought "people would [not] believe" him if he reported Uttaro's abuse. At the same time, he worried that he would be blamed, "d[id]n't want to be seen as weak or gay," and feared he would be "bullied at school." Uttaro also repeated his threat to shoot A.L. if he

reported the ongoing abuse. Due to A.L.'s exhaustion and feelings of "conflict[]" over the abuse and the fact that the person who was supposed to be his "guardian" was instead "being an evil person," A.L. tried and failed to shoot Uttaro and himself. A.L. was so vulnerable and Uttaro's intimidation so significant that A.L. thought he would rather die than report the abuse or continue to experience it. Yet A.L. repeatedly told law enforcement, social workers, and therapists that "nothing [inappropriate] happened" between him and Uttaro "[b]ecause [he] was so scared" of Uttaro and the repercussions of admitting the abuse. He simply did not feel able to reveal it until staffers at his inpatient treatment facility saw the inappropriate touching between him and Uttaro and Uttaro's resulting erection. Once Uttaro's visitation was terminated as a result, A.L. felt safe enough to discuss the abuse.

This evidence amply established that Uttaro exercised such domination and control over A.L. as to overcome his mind and overbear his will, proving the intimidation necessary to support the eight convictions he challenges on this basis.

CONCLUSION

The trial court did not abuse its discretion in excluding Uttaro's proffered evidence from A.L.'s youth assessment and screening inventory because it was not relevant to A.L.'s credibility. Additionally, A.L.'s testimony was not inherently incredible, and the evidence supported the jury's finding that Uttaro used intimidation to commit the eight challenged offenses. We therefore affirm the challenged convictions.

*Affirmed.*